1
2
3
4                          **UNITED STATES DISTRICT COURT**

5                        **EASTERN DISTRICT OF CALIFORNIA**

6
7    **FLAGSHIP WEST, LLC; MARVIN G.**        **1:02-CV-05200 OWW DLB**
     **REICHE; and KATHLEEN REICHE,**
8                                             **MEMORANDUM DECISION RE**
                                              **RESCISSION DAMAGES AND**
                    **Plaintiffs,**           **AVAILABILITY OF**
9                                             **PREJUDGMENT INTEREST**

10                       **v.**

11   **EXCEL REALTY PARTNERS L.P.; and NEW**
     **PLAN EXCEL REALTY TRUST, INC.,**
12
                    **Defendants.**
13
14
15                        **I.   INTRODUCTION**

16        Following a jury trial, verdicts in their favor, and an

17   award of contract damages in the amount of $1,480,740.00,

18   Flagship West, Marvin G. Reiche, and Kathleen Reiche

19   ("Plaintiffs") elected to rescind their lease with Defendants.

20   Plaintiffs seek restitution and consequential damages in lieu of

21   the contract damages awarded.  The only remaining issues to be

22   decided in this case are (1) the amount, if any, of rescission

23   and consequential damages that can be awarded based on the

24   evidence in the trial record; (2) whether Plaintiffs are entitled

25   to recover prejudgment interest on any or all of the damages

26   award.
27
28
                                  **1**

1

2                        **II.   BACKGROUND/PROCEDURAL HISTORY**

3          The dispute between the parties has been explained in great

4   detail in prior decisions.   For the purposes of this memorandum,

5   only a brief summary is necessary.

6          This case arises out of a 15-year lease between the parties

7   for the "exclusive right to operate a self service buffet style

8   family restaurant" within a shopping complex owned by Defendants

9   in Modesto, California.   (Lease § 6.3.)   The Lease commenced on

10  July 16, 1998.   (*Id*. at 1.)   Marvin and Kathleen Reiche then

11  began construction of a "Golden Corral" restaurant on the leased

12  property.   To finance the construction, Plaintiffs borrowed

13  approximately $2 million from The Money Store for a twenty-five

14  year term.

15         On June 10, 1999, Plaintiffs opened their restaurant.

16  Approximately one year later, a buffet restaurant called the Four

17  Seasons serving Chinese food opened in Defendants' shopping

18  complex in a location directly across from the Golden Corral.

19  Plaintiffs contend that Defendants breached the exclusive use

20  provision of the Lease (§ 6.3) by allowing the operation of the

21  other buffet restaurant and that the breach caused Plaintiffs'

22  restaurant to become unprofitable, leading to its closure on

23  April 1, 2001.

24         Plaintiffs filed suit alleging breach of contract, fraud,

25  and negligent misrepresentation, requesting contract damages and,

26  alternatively, rescission damages.   The case was tried before a

27  jury, beginning on November 12, 2003.   Verdicts were returned on

28  December 3, 2003.   The general verdict with interrogatories found

                                   **2**

in favor of the Plaintiffs and awarded them $1,480,740.00 in contract damages. (Doc. 279.)

Plaintiffs elected rescission in a post-trial brief filed December 29, 2003 (Doc. 301), after which a series of nine (9) briefs were filed by the parties and two oral arguments on the issues of rescission damages and related remedies were heard. (*See* Doc. 353, 3-4.)   Two memorandum decisions issued concerning Plaintiffs' post-trial election of remedies of rescission and rescission damages.  The first order (Doc. 353), issued on November 19, 2004 ("November 2004 Order"), addressed a number of issues relating to Plaintiffs' election of remedies, all of which were hotly contested by the parties.  The November 2004 Order scheduled another hearing for December 13, 2004 to address unanswered questions.  At the hearing, which was later rescheduled and held on February 7, 2005, the parties were given permission to file one additional brief each to address several open questions.  A second memorandum decision issued on September 30, 2005, ruled:

(1) The right to rescission was established by the jury's finding that the Lease had been materially breached. (Doc. 362 at 7-15.)

(2) Defendants were properly estopped from asserting that an anti-rescission clause contained within the lease barred rescission. (*Id*. at 15-19.)

(3) Rescission is not barred by the availability of an adequate legal remedy. (*Id*. at 19-21.)

(4) Plaintiffs are entitled to both restitution and certain types of consequential damages to return them to the

**3**

1    status quo ante.  (*Id*. at 21-27.)

2    (5)    The appropriate measure of damages for the improvements

3    to the land (i.e., the construction of the restaurant)

4    is either the cost expended by the buyer (if

5    reasonable) or the value to the seller, whichever is

6    greater.  (*Id*. at 27-29.)

7    (6)    Defendants are entitled to an equitable adjustment for

8    the monthly fair rental value of the property, but

9    Defendants are not entitled to an enhanced offset for

10    the rental value of improvements Plaintiffs funded.

11    (*Id*. at 29-30.)

12    (7)    The subcategories of consequential damages sought by

13    Plaintiffs needed to be clarified.  To the extent that

14    Plaintiffs claim rent payments made pursuant to the

15    forbearance agreement, such payments are recoverable as

16    consequential damages.  However, to the extent that

17    Plaintiffs seek "lost profits," such damages are

18    contractual, not consequential, and are therefore not

19    recoverable in rescission.  (*Id*. at 30-33.)

20    Thereafter, Plaintiffs submitted citations to the evidence

21    to aid the district court's calculation of rescission damages

22    (Doc. 365), and Defendants responded (Doc. 371).  Defendants then

23    submitted a brief essentially requesting further discovery with

24    respect to documents pertaining to the forgiveness of interest

25    and or principal on Plaintiffs' loans held by The Money Store.

26    (Doc. 374.)  Plaintiffs opposed any such further discovery.  (*See*

27    Doc. 375.)  Next, the parties filed briefs regarding the recovery

28    of prejudgment interest.  (Docs. 378 & 379.)  Finally, letter

**4**

1  briefs were submitted addressing evidence of Plaintiffs' payment

2  of rent.  (Docs. 381, 382, & 384.)  A final teleconference was

3  held on June 29, 2006, at which time the parties endeavored to

4  answer several remaining questions posed by the district court.

5  (Doc. 386.)  The matters of rescission damages and prejudgment

6  interest were then submitted for decision

7

8                    **III.  DISCUSSION**

9  **A.    Rescission Damages Calculation.**

10           **1.    Pre-Opening Expenses.**

11                    **a.    *Construction.***

12       Plaintiffs seek $1,270,252 for the cost of construction.

13  Defendants asserts that only $1,096,978 of this is reflected in

14  the trial record.

15       To support the higher figure, Plaintiffs cite the testimony

16  of expert Rob Wallace (Trial Transcript ("Tr.") at 924) and Joint

17  Trial Exhibit ("JTE") 157.  Defendants assert that JTE 181 is

18  also relevant.

19       Defendants make three objections to the evidence offered by

20  Plaintiffs.  First, Defendants object to the consideration of Mr.

21  Wallace's testimony as evidence on the issue of damages.  Mr.

22  Wallace, who was called as an expert on financial matters,

23  examined Flagship's financial records and testified, using a

24  series of pie charts, as to the total investment made by

25  Plaintiffs in the Golden Corral restaurant, including his

26  estimate that $1,270,252 was spent on construction.  The pie

27  charts were admitted into evidence as Plaintiffs' Exhibit ("PE")

28  58.  Defendants object that Wallace's testimony is hearsay on the

                              **5**

issue of damages, because Wallace had no firsthand knowledge of any of the alleged construction expenses to which he testified. Defendants point to statements Plaintiffs' counsel, Mr. Fairbrook, made during the trial that, at first glance, appear to have disclaimed any right to cite Wallace's testimony pie charts as evidence of damages:

> MR. FAIRBROOK: I might be able to shortcut this a little bit because I think what Mr. Carroll is concerned about is those pie charts that showed the total investment of about $3.5 million. I will not argue that that is a measure of damage. I will not argue that that is the amount that should be recovered.
>
> That is evidence in the case. It shows a compilation of various expenses, it shows the investment. It serves to test some of the reasonableness of some of the other calculations.
>
> With respect to our special damages and the recoupment of our losses and investments, those will be done specifically item by item, cost by cost, and it does not equal that total number of those pie charts, so I will not be arguing that that equates to our damages.

(Tr. at 1517:1-15.)  However, Defendants quote Plaintiffs' counsel out of context.  The above-quoted statement was made in the context of crafting the jury instructions regarding contract damages.  There was a lengthy discussion between the parties and the district court concerning the appropriate measure for contract damages and whether Mr. Wallace's various analyses could be referenced as evidence of <u>contract</u> damages.  (Tr. at 1462-1472.)  In fact, counsel for Defendants specifically argued that one of Wallace's assertions was that "every single dime that has ever been inserted into this business should somehow be given back because there has been a purported breach of contract." (Tr. at 1470:14-15.)  This, Defendants asserted, was relevant

**6**

only to "rescission." (*Id.*; Tr. at 1516.)  In response,
Plaintiffs' counsel eventually conceded that he would not argue
that Wallace's estimates were evidence of <u>contract</u> damages.  Now,
however, it is entirely proper for Plaintiffs to utilize
Wallace's estimates as evidence of rescission damages.
Defendants themselves acknowledged as much.

Wallace specifically testified that $1,270,252 was spent on
construction.  (Tr. at 924:15.)  Defendants present no directly
contrary evidence.  He is both a CPA and a financial analyst.  He
was entitled and qualified to review and prepare a compliation,
summary, or abstract of construction and business expenses from
Flagship's underlying accounting and business records.

Even if Wallace's testimony was inadmissible, JTE 157
enumerates that $1,239,030 was spent on the "building."
Defendants object to reliance on JTE 157, a one-page summary
document that explains that $1,239,030 was spent on the
"building."  Mr. Reiche testified that JTE 157 was prepared by
Flagship's bookkeeper Lynn Myers.  (Tr. at 599.)  Defendants
object that Mr. Reiche was not qualified to provide any
foundation as to payments described in JTE 157.  Ms. Myers, the
author of the document, testified at trial, but she did not
provide any foundation for JTE 157.  However, the exhibit was
admitted into evidence without objection through Mr. Reiche (Tr.
at 599), who was consulted whenever bills were payed, so it may
be relied upon.

JTE 181 provides further support for Wallace's estimate.
Page 124 of JTE 181 is an invoice from Flagship's general
contractor, indicating the total cost of construction of the

1   restaurant as of June 24, 1999 was $1,239,030.  Defendants point

2   out that the invoice indicates that only $1,096,978 was paid by

3   Flagship as of the date of that invoice (i.e., a balance of just

4   over $142,000 was due).  However, there was general testimony

5   from Ms. Meyers suggesting that, with the exception of interest

6   due on the Money Store loan after Flagship defaulted on the loan,

7   Flagship paid all of its bills that were actually due (i.e.,

8   those bills that were not disputed or disputable in some way).

9   (Tr. at 1491:19-20; 1494-96.)  Defendants present no evidence to

10  the contrary.[1]

11      There is an unexplained discrepancy between Wallace's

12  estimate that $1,270,252 was spent on construction and the

13  $1,239,030 figure provided on both JTE 157 and JTE 181.  Although

14  Wallace explained that his estimate was based upon his review of

15  the company's financial records and his calculation was not

16  challenged in substance during the trial, JTE 157 was prepared by

17  Lynn Meyers, Flagship's own bookkeeper, based upon Flagship's

18  records of which she had personal knowledge.  There is no

19  specific evidence to support Wallace's higher damages figure.

20  Plaintiffs will be awarded **$1,239,030** in rescission damages for

21  construction costs incurred, as documented on Flagship's own

22  summary and confirmed by the contractor invoice.

23

24      [1]   Defendants also argue that the invoices contained
    within JTE 181 are hearsay.  But, it does not appear that
25  Defendants raised this objection (at least not successfully)
    during trial.  The exhibit was admitted in to evidence and is
26  part of the record and is appropriately referenced in calculating
    rescission damages.  It was a business record of Flagship's and
27  Defendants did not dispute its authenticity as a contractor
    invoice.
28

**8**

1

2 **b.   Equipment.**

3    Plaintiffs seek $598,782 for expenditures on restaurant

4 equipment.  Defendants assert only $581,526 is documented in the

5 record, leaving $17,256 unaccounted for.

6    An invoice from the Coastal Equipment Company indicates a

7 total balance due of $589,272 for equipment.  (JTE 181 0133.)

8 Although the invoice reflects that only $581,526 had been paid as

9 of the invoice date, there was testimony from Ms. Meyers that all

10 bills were paid in full (Tr. at 1491), and no evidence to the

11 contrary.

12    Plaintiffs' higher $598,782 figure is based on Wallace's

13 testimony.  (Tr. at 924:16)  Wallace testified he reached this

14 number by examining the financial records of the company.  His

15 calculation was not challenged in substance during the trial.

16 However, again, under Federal Rule of Evidence 1006, underlying

17 records were not provided to support the higher figure.  (*See* JTE

18 181.)  It is most reasonable to award Plaintiffs the lower, but

19 better-documented **$589,271** in rescission damages for equipment,

20 less any offset for salvage.  *See* Part III.E.

21

22 **2.   Opening Inventory.**

23    Plaintiffs seek $30,000 in damages expended for "opening

24 inventory."  Defendants assert that there is no non-hearsay

25 evidence that this expense was incurred.  Specifically,

26 Defendants insist that there is no independent evidence that

27 Plaintiffs incurred a $30,000 opening inventory expense above and

28 beyond the $598,782 equipment costs.

   Mr. Reiche testified explicitly that Flagship spent $30,000

on inventory in connection with opening the store.  (Tr. at 606.)
Defendants made no objection at the time to this testimony.

Defendants objected at the March 14, 2006 hearing that there
was no evidence separating the $30,000 from the other opening
expenses, suggesting that Plaintiffs are seeking a duplicate
award.  But, Mr. Reiche clearly differentiated between the
$30,000 spent on opening inventory (Tr. at 606) and the other
categories of opening expenses such as training costs (*id*.),
equipment costs (*id*. at 604), and the franchise fee (*id*. at 602).
An award of **$30,000** for opening inventory is fully justified.

### 3.   **Building and Related Fees**.

Plaintiffs claim that $104,176 were expended on building
fees.  Defendants assert that only $73,763 is documented in the
record, leaving unaccounted $30,413.

Plaintiffs' initial figure comes from Wallace's testimony.
(Tr. at 924:18.)  Defendants suggest that this figure counts
certain costs that are not properly classified as "building
fees."  JTE 157 specifically enumerates a number of expenses that
are obviously building permit fees, specifically $70,467 for
"City of Modesto Fee," $2,217 for "City of Modesto Filing Fee,"
$221 for "City of Modesto Plan Check," and $857 for "Modesto City
Schools," which total $73,763.  There are also some additional
architectural, engineering, and environmental assessment fees on
JTE 157.  Specifically, there are three entries on JT 157 for
"Lehmann Mehler HRST," totaling $36,550, a $3,074 itemization for
"Kleinfelder," and two entries for "Northwest Environcon"
totalling $3,100.  Mr. Reiche testified that Lehmann Mehler was

Flagship's architect, and that Kleinfelder and Northwest Environcon performed various environmental and engineering testing for the construction site. (Tr. at 602 & 603.) In total, adding these fees to the $73,763 figure, the grand total is $116,486. This figure actually exceeds Wallace's $104,176 estimate by more than $12,000. Defendants object, essentially, that Plaintiffs' recovery should be limited to the $73,763 of expenses listed on JT 157 that are clearly "building fees."

Plaintiffs have acknowledged that their initial request for $104,176, based on Wallace's estimate, may lump together a number of different types of fees, some of which are not strictly building permit fees. But, all such fees, including engineering and site assessment fees were incurred in connection with the design and construction of the restaurant in reliance on the lease. They are therefore all recoverable.

Defendants suggested during the March 14, 2006 hearing that these miscellaneous expenses are not recoverable because they were incurred before the lease was signed in July of 1998. But, these fees were all incurred in connection with the disputed lease site and are therefore reasonably deemed to have been expended in reliance on the lease terms.

Plaintiffs are entitled to recover the full amount requested: **$104,176**[2] for building fees, engineering and architectural services, and environmental and site assessment costs.

---

[2]    Although a slightly higher award reflecting the sum of all of the City of Modesto, Lehmann Mehler, Northwest Environcon, and Kleinfelder entries on JTE 157 might have been justified here, Plaintiffs only requested $104,176.

**11**

1

### 4.   Franchise Fee.

Defendants do not object to Plaintiffs' request for reimbursement of the **$30,000** franchise fee, a request that is supported by record evidence.  (JTE 157; Tr. at 924:18.)

### 5.   Training.

Plaintiffs seek $18,749 for expenses incurred training new staff to open the restaurant.  Mr. Wallace articulated this figure during his trial testimony.  (Tr. at 924:19.)  Defendants assert that this figure represents the cost of training managers for all three Flagship restaurants and, therefore, that Plaintiffs are only entitled to recovery of one-third, or $6,250. However, Mr. Reiche testified generally that these claimed expenses were incurred for training only for the Modesto managers.  (Tr. at 604-05.)  This assertion is supported by a document in evidence entitled "Breakdown of Management Training Costs for Modesto Store," which indicates that the total cost for "Training for Modesto Management" was $18,749.  (JTE 181 0111-0112.)  Defendants do not cite any contrary evidence.

Plaintiffs are entitled to recover **$18,749** for expenses incurred training managers for the Modesto restaurant.

### 6.   Construction Interest.

As part of the pre-opening initial investment, Plaintiffs seeks $27,956 in "construction interest" purportedly paid prior to the opening of the restaurant as part of the pre-opening

1  initial investment.[3]   The only direct evidence supporting this

2  figure is Mr. Wallace's testimony.   Wallace describes this figure

3  as "interest on the loan prior to the opening," and includes it

4  as a part of the total expenses incurred at or prior to the

5  opening of the Modesto Restaurant.   (Tr. at 924:20-21.)

6  Defendants object to this requested award, asserting that there

7  is no evidence that any such interest was ever paid.

8       There is some indirect evidence, however, that suggests all

9  of the interest due on the Money Store loan was paid in full

10  prior to July 2000, at which time Flagship went into default on

11  the Money Store Loan.   Mr. Reiche specifically testified that the

12  first payment that "was missing" was the July 1, 2000 interest

13  payment.   (Tr. 655: 814.)   As discussed in greater detail below,

14  Flagship's financial statements specifically reflect the monthly

15  interest costs incurred by Plaintiffs from the time the

16  restaurant opened in mid-1999 until the end of 2000.   (*See*

17  *generally* JTE 147.)   Mr. Wallace's testimony, and common sense,

18  support the assertion that interest was to be paid on the loan

19  prior to completion of the construction.   Wallace unequivocally

20  categorized the $27,956 interest as a portion of the initial

21  investment made by Plaintiffs in the Modesto store and Defendants

22  present no evidence to the contrary.

23       Plaintiffs are entitled to **$27,956** for interest paid on the

24  Money Store Loan during construction.

25  ───────────────

26       [3]   Plaintiffs separately request an award of $303,556 they
   claim to have paid toward interest on the money store loan
27  incurred after the opening of the restaurant but prior to the
   execution of the forbearance agreement.   This request is analyzed
28  below.

1     **B.     Rent Paid to Excel**.

2         Plaintiffs initially asserted that they paid $394,081 in

3     rent to Defendants, but revised this number downward to $372,575

4     in subsequent submissions.  (*See* Doc. 381, March 31, 2006

5     letter).  Defendants assert that the correct figure is $369,775.

6     The difference between these two figures is $2800.  Plaintiffs'

7     higher figure includes a rent increase for several months in 2003

8     set forth in the lease.  Defendants acknowledge that the lease

9     contains such a provision, but assert that Flagship was never

10    billed for the increased rent and never paid any increased rent.

11    Defendants, however, cannot point to any record evidence in

12    support of this assertion.  Instead, Defendants submit extra-

13    record evidence regarding the actual amount of rent paid by

14    Flagship.  (Doc 371, filed Mar. 22, 2006.)  The district court

15    previously ruled that rescission damages in this case will be

16    calculated based on record evidence presented during the jury

17    trial.  It was for Defendants to present the evidence of payment

18    at trial.  The new evidence cannot be considered.  Plaintiffs are

19    entitled to post-trial recovery of **$372,575** for rent before the

20    breach of the lease.

21

22    **C.     Interest**.

23         **1.     Interest Paid on The Money Store Loan**.

24         Plaintiffs assert that they paid $303,556 in interest on the

25    The Money Store loan, interest that was incurred from the

26    completion of construction through 2000.  The evidence Plaintiffs

27    cite in support of this figure is the forbearance agreement

28    entered into by The Money Store and Flagship (JTE 113), Mr.

**14**

Reiche's testimony (Tr. at 589), and a number of profit and loss statements for 1999 and 2000 (e.g., JTE 147 0097 and 0207). (Doc. 365 at 6.)

First, it is not clear how the cited page from Mr. Reiche's testimony supports any assertion as to the payment of interest on The Money Store loan.  At page 589, Reiche testified that Flagship paid $7200 under the lease each month for rent and maintenance of the common shopping center areas.  However, Mr. Reiche did not even suggest that this figure included any interest paid on The Money Store loan.

Second, the forbearance agreement on its face does not shed any light on the amount of interest paid, at least with respect to the four corners of the document.

The affirmative evidence of interest paid comes from two sources in the record:  Flagship's profit and loss statements ("P&Ls") (JTE 147 and 162) and Mr. Reiche's testimony.  The P&Ls chronicle the amount of interest incurred under the loan each month.[4]  Specifically, the P&Ls indicate that $84,668 in interest was incurred in 1999, while $218,888 was incurred for 2000.  However, the P&L's <u>do not prove that the incurred interest was ever paid</u>.  The only relevant record evidence that could be located by the district court (which was cited by neither party) is Mr. Reiche's testimony that Flagship defaulted on its interest

---

[4]    For an unexplained reason, the June 1999 statement does not reflect any interest due (JTE 147 0084-85), and the July 1999 statement actually reflects an interest credit of $1,197 (JTE 147 0087).  Starting in August 1999, the interest due is stated to be $15,921, a figure that increases slightly every month thereafter (*see generally* JTE 147).

payments for the first time on July 1, 2006.  (Tr. 655)  Contrary
to Defendants' assertion, this implies that Flagship paid in full
all interest due on the loan prior to that date.  However,
Reiche's trial testimony is inconsistent with Plaintiffs' present
assertion that they paid interest after that date.[5]  Rather, the
record suggests that Plaintiffs only paid interest through June
2000.  Accordingly, the total award for interest <u>paid</u> after
completion of construction is $84,668 for 1999 and $101,726[6] for
2000, for a grand total of **<u>$186,394</u>**, not the $303,556 claimed by
Plaintiffs, which is unsupported by the evidence.

### 2.   Accrued Interest on The Money Store Loan Through Trial.

Plaintiffs also request an award equal to the amount of
interest <u>accrued</u> (but unpaid) on The Money Store loan through the
end of trial: $548,155.  Plaintiffs note that the district court
previously ruled in this case that "interest (paid and unpaid) on
the...the Money Store loan" was a recoverable form of rescission
damages under California Civil Code § 1692 and *Runyon v. Pacific
Air Industries, Inc.*, 2 Cal. 3d 304, 316-17 (1970).  (Doc. 362 at
31.)  Section 1692 provides that in an action for rescission
"[t]he aggrieved party shall be awarded complete relief,
including restitution of benefits, if any, conferred by him as a
result of the transaction and any consequential damages to which

---

[5]    Interest on The Money Store loan first appears in the
P&Ls in July 1999.

[6]    *See* JTE 147 0195, which reflects the total amount of
interest incurred from January 2000 through June 2000.

**16**

he is entitled; but such relief shall not include duplicate or inconsistent items of recovery." *Runyan* stands for the principle that in a rescission case consequential damages may be awarded "to restore both parties to their former position as far as possible." 2 Cal. 3d at 316.

First, as discussed above, Mr. Reiche's testimony that Flagship defaulted on its interest payments as of July 1, 2000 establishes that any interest due thereafter went <u>unpaid</u> (i.e., interest began to accrue in July 2000). There is record evidence regarding the amount of this accrued interest for the remainder of 2000. Subtracting the interest paid through June 2000 ($101,726) from the total amount of interest due in 2000 ($218,888), leaves a remainder of $117,162 <u>unpaid</u> (accrued) interest for 2000.

It is not as easy to discern from the record the amount of interest accrued from the start of 2001 through the jury's verdict on December 3, 2003. The only relevant record evidence is an estimate and related diagram prepared by Mr. Wallace. (Tr. at 956; PE 58.) Specifically, Wallace testified that the accrued interest on The Money Store loan was $548,155, a figure he based on "a calculation" rather than financial statements "because we didn't know the exact amount of that interest, so we had to make some estimates there as to the interest rate and the term." (Tr. at 956.) This estimate is reflected in a set of pie charts used by Mr. Wallace to answer two questions: (1) "Where did the money come from to build and operate the Modesto Golden Corral," and

**17**

(2) "Where did the money go?"  (PE 58.)[7]   Wallace testified that all of the estimates presented in PE 58, cover a time period from the inception of the Modesto restaurant in June 1999 through December 2003.  (Tr. 905-907.)

This relatively straightforward record is complicated by the forbearance agreement, which took effect in October 2001.  (JTE 113 0001-0006.)  Under the terms of that agreement, The Money Store agreed to release its interest in the Modesto Golden Corral restaurant property in exchange for a lump sum payment of $900,000 from the proceeds of the sale of the Modesto property. (*Id*. at ¶6.)  The agreement specifically provides that this $900,000 "shall be applied to past due arrearages on the Modesto loan and then to the principal on the Modesto loan.  At no time should the payment under this paragraph exceed the balance due under the loan."  (*Id*.)  In addition to the $900,000 lump sum payment from the proceeds of the property sale, Plaintiffs agreed to assign to the Money Store the net proceeds of this lawsuit (originally filed by Flagship and Reiche in Stanislaus County), to be applied to past-due arrearages on the Modesto Loan, if any, and then to a reduction of the principal balance.  (*Id*. at ¶7.)[8] The parties agreed that "[t]he first $500,000 of the net proceeds [from the litigation] would go to [The Money Store].  Any net

---

[7]     For an unexplained reason, Mr. Wallace's pie charts indicate that the $548,155 in estimated accrued interest should be considered both part of the initial investment pie chart and part of the expenditures pie chart.

[8]     The Forbearance agreement also concerned a separate loan (the "Stockton Loan") and included various provision requiring specific payments toward that loan.

1   proceeds over $500,000 from the litigation will be equally

2   divided between [The Money Store] and Flagship." (*Id.*)

3       Defendants argue that the forbearance agreement operates to

4   bar any recovery in rescission for accrued interest.  But,

5   Defendants offer no legal authority to support this assertion,

6   nor is there any logic to Defendants' position.  All the

7   forbearance agreement accomplishes is to assign proceeds from

8   this litigation to the lender to compensate the lender for both

9   accrued interest and the principal balance on the loan.  Nowhere

10  does the forbearance agreement indicate any intent by the lender

11  to forgive interest payments already accrued or to stop the

12  accrual of interest on The Money Store loan pending any recovery

13  in this lawsuit.  The forbearance agreement does not bar recovery

14  of accrued interest.

15      The question remains, however, whether Mr. Wallace's

16  "estimate" is sufficient proof to warrant the full recovery

17  requested by Plaintiffs.  Defendants offered no evidence at trial

18  to undermine Mr. Wallace's estimates.  Wallace explained the

19  source of the information he used to generate his estimates (Tr.

20  at 905:5-7).  This was a proper subject for expert testimony and

21  the evidence was accepted without objection to its accuracy or

22  foundation.  (Tr. at 954, admission of PE 58.)

23       There is record evidence, however, tending to suggest that

24  Mr. Wallace's estimate of interest accrued encompasses interest

25  accrued during the second half of 1999 and the first half of

26  2000, for which Plaintiffs have been awarded separate

27  reimbursement of $186,394 for "interest paid."  Specifically, Mr.

28  Wallace testified that all of the estimates presented in PE 58,

**19**

1   the pie charts described above, are calculated from the inception

2   of the Modesto restaurant in June 1999 through December 2003.

3   (Tr. 905-907.)  Although this period appears not to include any

4   interest accrued during the construction phase (for which

5   Plaintiffs have been separately awarded $27,956 in interest paid

6   during the construction phase), it does encompass the period of

7   time for which Plaintiffs have been awarded $186,394 for

8   "interest paid.

9       Most critically,. what Wallace did not do was to calculate

10  (or otherwise consider) the effect of the forbearance agreement

11  on the calculation of interest accruing after October 2001.  Nor

12  did he give credit for the $900,000 lump sum payment or calculate

13  interest based on the reduced unpaid principal balance resulting

14  from the lump sum payment.  It was incumbant on Plaintiffs to

15  make these calculations.  They have not done so.  They have

16  failed to prove the amount of any accrued unpaid interest on the

17  Money Store Loan and the effect of the forbearance agreement on

18  the accrual of interest.  Plaintiffs did not present this

19  information at trial and refused to provide such evidence post

20  trial.  They are bound by their choice.  Plaintiffs shall not

21  recover any other accrued interest.

22

23          **3.   Accrued Interest on The Money Store Loan since the**
24               **Jury's Verdict.**

25      Plaintiffs initially requested an additional $358,416 to

26  reimburse them for interest accrued on The Money Store loan since

27  the conclusion of the trial.  To reach this figure, Plaintiffs

28  estimated interest using the same calculation Wallace employed to

**20**

1  calculate accrued interest prior to the jury's verdict.  However,

2  at the March 14, 2006 hearing, Plaintiffs withdrew this request.

3  In light of the court's ruling on accrued interest, this

4  withdrawn claim is also moot.

5

6        **D.**   **Business Losses**.

7       Plaintiffs seek $186,903 in "business losses."[9]  Generally,

8  business losses are considered a form of unrecoverable benefit of

9  the bargain contract damages.  Plaintiffs, however, insist that

10 these loses are recoverable to restore Plaintiffs to the status

11 quo ante.  Specifically, Plaintiffs argue that they sunk $186,903

12 into operating expenses at the Golden Corral in excess of

13 revenues generated by the restaurant.  A portion of these sunk

14 costs were actually expended prior to the opening of the Four

15 Seasons Buffet, while some were incurred after the opening of the

16 competing Buffet.

17      Defendants first object that any losses incurred <u>prior</u> to

18

19     [9]   Plaintiffs reach this figure by taking the sum of two
20 general categories of "losses" identified by Mr. Wallace, the
   $359,289 lost before the Four Seasons Buffet opened and $525,271
21 lost after the Four Seasons Buffet opened, which total $884,560.
   Plaintiffs assert, however, that this figure included rent
22 payments made by Plaintiffs through trial ($394,081) as well as
   interest paid on the Money Store loan prior to entering into the
23 Forbearance Agreement ($303,576).  Subtracting these two figures
   from the $884,271 equals the requested $186,903.
24     Notably, if Plaintiffs are correct that the $844,560 figure
   includes interest paid on the Money Store loan, this arguably
25 conflicts with the court's conclusion that Mr. Wallace's accrued
   interest calculation includes at least a portion of the interest
26 Plaintiffs claim to have paid during 1999 and 2000.  However,
   Plaintiffs provide no record citations to support their assertion
27 and the district court could locate no such evidence in the
28 record.

**21**

1   the opening of the Four Seasons were simply ordinary losses

2   incurred by a new restaurant running an unprofitable business.

3   Defendants also object that any losses incurred after the opening

4   of the Four Seasons, and any expectation on Plaintiffs part that

5   they would be recouped, are part of the "benefit of the bargain."

6       Plaintiffs suggest that these business losses are

7   recoverable in rescission as a means "to restore both parties to

8   their former position as far as possible." *Runyan*, 2 Cal. 3d at

9   316.   In *Runyan*, the California Supreme Court reasoned that "[i]t

10  is the purpose of rescission 'to restore both parties to their

11  former position as far as possible.'" *Id*.   The trial court in

12  *Runyan* entered judgment rescinding an exclusive franchise

13  contract and awarded the plaintiff franchisee restitution of the

14  price of the franchise as well as consequential damages.   The

15  consequential damage award included a sum of money to compensate

16  him for the income he would have gained if he had remained at his

17  prior place of employment.   The California Supreme Court affirmed

18  this award, reasoning that

19              [P]laintiff recovered his original consideration and
                the damages he sustained in reliance on the contract.
20              [Defendant] retrieved the exclusive franchise and was
                given credit for what it in effect had produced. We are
21              satisfied that the trial court thus "adjusted the
                equities" between the parties and restored them to
22              their former positions so far as it was possible to do
                so.

23  *Id*. at 319.

24

25      Here, the nature of the reimbursement requested is quite

26  different.   Plaintiffs seek reimbursement not for lost income

27  from a source external to the contract, but for losses suffered

28  as a result of business activities undertaken pursuant to the

**22**

contract.  There was testimony at trial indicating that it is
normal and expected for a Restaurant to experience losses during
its first few years of operation.  (*See, e.g.,* Tr. at 617-18.)
Some restaurants succeed in recouping these expenses through the
operation of the business, while others do not.

On the one hand, Defendants are correct that Plaintiffs
expectation of recouping their operating losses over time is a
benefit of the bargain that can only be classified as a form of
contract damages.  On the other hand, Plaintiffs assert that they
relied upon the lease in incurring those losses.  But,
Defendants's response is compelling:

> Post contract operating losses such as those claimed by
> Plaintiffs (as opposed to set up expenditures), are, as
> a matter of law, compensable only as expectation
> (contract) damages. <u>This is because pre-breach losses
> were not caused by Excel — by definition Excel had not
> breached the contract yet, and accordingly, it cannot
> have caused those losses. And post breach losses —
> equally by definition — are not compensable in
> rescission because they could not have been incurred in
> reliance on the Lease</u>. Plaintiffs are not entitled to
> operating losses in rescission. An award of such losses
> would result in an inequitable windfall, an outcome
> that no court in equity will allow. Plaintiffs must
> elect either expectation damages or rescission damages.
> They may not recover both....

(Doc. 371-1, at 9.)  Plaintiffs offer no authority squarely
indicating that rescission damages are appropriate under the
circumstances.  Accordingly, this request for recovery of
operating losses is **DENIED.**

//

//

//

//

1

**E.     CREDITS**

2

**1.     Use of Premises by Plaintiffs**

3      Defendants seek a $434,716 credit to account for rent

4   actually paid or rent payments that are due.  (*See* Doc. 362, at

5   30, prior memorandum decision holding that Defendants should

6   receive a credit for the fair rental value of the leasehold as

7   evidenced by the lease.)   This represents a setoff for the

8   reasonable rental value of the premises for the period of

9   Plaintiffs' occupancy from May 1999 to June 2004.   Plaintiffs do

10  not dispute Defendants' entitlement to a setoff credit in this

11  amount.   Defendants shall receive a credit of **$434,716** for rent

12  actually paid by Plaintiffs to Excel and for unpaid rent due.

13

14

**2.     Plaintiffs' Rental Income**

15      It appears to be undisputed that Excel is entitled to a

16  **$10,000** credit for rent Plaintiffs collected after Plaintiffs

17  sublet the leased property.

18

19

**3.     Equipment Sold at Auction**

20      It also appears undisputed that Excel is entitled to a

21  $11,260 credit to account for the funds collected after

22  Flagship's equipment was sold at auction.   Excel seeks an

23  additional credit for the full <u>cost</u> of the equipment, asserting

24  that The Money Store forced Plaintiffs to sell the equipment at a

25  "commercially unreasonable firesale."   Excel, however, cites

26  absolutely no legal authority to support this assertion.

27      Excel shall receive only a **$11,260** credit for the funds

28  collected after the auction.

**24**

**F.   <u>Prejudgment Interest</u>.**

The availability of prejudgment interest is governed by California Civil Code Section 3287(a), which provides:

> <u>Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day</u>, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt. This section is applicable to recovery of damages and interest from any such debtor, including the state or any county, city, city and county, municipal corporation, public district, public agency, or any political subdivision of the state.

Under section 3287(a), prejudgment interest is available when "defendant actually know[s] the amount owed or from reasonably available information could the defendant have computed that amount." *Cassinos v. Union Oil. Co.*, 14 Cal. App. 4th 1770, 1789 (1993). In *Cassinos*, a case relied upon by both sides, the defendant was found liable for having improperly injected wastewater into plaintiffs property. The *Cassinos* court found that, at the time of the improper conduct, the defendant both knew that it was injecting wastewater onto Plaintiffs land, knew the market rate for properly disposing of the wastewater, and could track the volume of wastewater disposed of in this manner "from which it could calculate its indebtedness." *Id*. Under such circumstances, prejudgment interest may be awarded from the "inception of the occurrence." *Id*.

> It is the rule that if damages may be determined by reference to reasonably ascertainable market values, they are 'capable of being made certain by calculation' within the meaning of section 3287...The mere fact that proof is required to determine the market value of property on a designated date, will not prevent the allowance of interest under section 3287 ....

*Id.* In contrast, prejudgment interest is not available where damages are "considered uncertain until [they] have been determined by the court upon presentation of evidence." *Id.* As an example, the Cassinos court mentioned actions in quantum meruit, where "[t]ypically, plaintiff's claim is in the nature of an unliquidated and uncertain demand and therefore prejudgment interest is disallowed." *Id.* A number of cases cited by Plaintiffs are in accord, exemplifying situations where the amount due can be determined by reference to a fixed standard. *See e.g.*, *Leaf v. Phil Ranch, Inc.*, 47 Cal. App. 3d 371 (1975)(sum paid by plaintiffs for automobile was fixed by the terms of the contract and therefore was certain enough to be subject to prejudgment interest, even though there was dispute as to offset allowed defendant for plaintiff's use of the car prior to rescission); *Tripp v. Swoap*, 17 Cal. 3d 671, 682 (1976)(welfare benefits are capable of calculation because welfare laws set forth fixed payment schedules).[10]

Here, a number of damages categories could not have been

---

[10]    In support of their request for prejudgment interest on its entire damages award, Plaintiffs also cite *Marine Terminals Corp. v. Paceco, Inc.*, 145 Cal. App. 3d 991, 995 (1983), which involved a claim for breach of contract and negligence arising from the faulty repair of a piece of construction equipment by the defendant. After defendant's errors were discovered, the plaintiff supplied defendant with invoices reflecting how much it would cost to fix the equipment properly. Defendant denied liability for the costs reflected in the invoices, but did not dispute the charges contained in the invoices. "By submitting the invoices to defendant, plaintiff made its damages known to defendant and rendered them 'certain.'" *Id.* at 996. But, *Marine Terminals* is distinguishable, as Plaintiffs never made an unconditional demand for rescission. (*See* Tr. 1429:1-8; 1431:1-4; 1438:19-25 (finding that only a conditional tender was made).)

1 calculated by reference to a fixed standard or fixed payment

2 schedule:  $1,239,030 for construction costs, $589,271 for

3 equipment, $30,000 for opening inventory, $104,176 for building

4 and associated fees, $30,000 for the franchise fee, and $18,749

5 for training.  These categories total $2,011,226.  Under no

6 reasonable reading of the law could these categories of damages

7 be calculable as required by § 3287 to be the subject of a

8 prejudgment interest award.

9      The two remaining types of damages to which Plaintiffs are

10 entitled could conceivably have been calculated "from reasonably

11 available information."  *Cassinos*, 14 Cal. App. 4th at 1789.

12 Specifically, the rent and interest payments could have been

13 calculated by reference to a fixed standard or fixed payment

14 schedule.  However, any award to Plaintiffs for rent payments

15 made have been offset entirely by the credit to Defendants for

16 the reasonable rental value of the property.  This leaves the

17 amount of interest paid and accrued on the Money Store loan, a

18 total of $214,350 (including the $27,956 in construction

19 interest, and $186,394 in interest paid).

20      The question then becomes, can the $576,111 award for

21 interest paid and accrued on the Money Store Loan be severed from

22 the remainder of the award for purposes of a prejudgment interest

23 calculation.  No authority supporting such a procedure has been

24 provided or was located, nor is severance of certain categories

25 of damages consistent with the overall purpose of restricting

26 prejudgment interest to cases in which a person's entitlement to

27 recover damages is "certain, or capable of being made certain by

28 calculation."  Cal. Civil Code. § 3287(a).  "[I]nterest

traditionally has been denied on unliquidated claims because of

the general equitable principle that a person who does not know what sum is owed cannot be in default for failure to pay." *Chesapeake Indus., Inc. v. Togova Enter., Inc.*, 149 Cal. App. 3d 901, 906 (1983).

### IV. CONCLUSION

For all the reasons set forth above:

(1)   Plaintiffs are entitled to an award of $2,142,175 for damages in rescission:

| | |
|---|---|
| $1,239,030 | Construction Costs |
| $589,271 | Equipment Expenditures |
| $30,000 | Opening Inventory for Restaurant |
| $104,176 | Building and Related Fees |
| $30,000 | Franchise Fee |
| $18,749 | Training of Modesto Staff |
| $27,956 | Construction Interest |
| $372,575 | Rent Paid to Excel |
| $186,394 | Interest Paid After Opening |
| ($434,716) | Credit for Rent Paid or Owed to Excel |
| ($10,000) | Credit for Rental Income Credit |
| ($11,260) | Credit for Equipment Sale |
| $2,142,175 | Total |

(2)   Plaintiffs demand for an award of prejudgment interest is **DENIED.**

Plaintiffs shall submit a form of judgment consistent with this memorandum decision.

**SO ORDERED**

**Dated:   November 14, 2006**

**/s/ Oliver W. Wanger**
**Oliver W. Wanger**
**UNITED STATES DISTRICT JUDGE**
