1

2

3

4

5       IN THE UNITED STATES DISTRICT COURT FOR THE

6              EASTERN DISTRICT OF CALIFORNIA

7

8   FLAGSHIP WEST, LLC, et al.,    )        No. CV-F-02-5200 OWW/DLB
                                   )
9                                  )        MEMORANDUM DECISION AND
                                   )        ORDER GRANTING PLAINTIFFS'
10              Plaintiffs,        )        MOTION FOR INTERPRETATION OF
                                   )        LEASE (Doc. 500) AND DENYING
11        vs.                      )        DEFENDANT'S MOTION TO STRIKE
                                   )        AND/OR FOR LEAVE TO FILE
12                                 )        SUR-REPLY BRIEF (Doc. 508)
    EXCEL REALTY PARTNERS, L.P.,   )
13  et al.,                        )
                                   )
14                                 )
                                   )
15              Defendants.        )
                                   )
16  _____)

17

18

19        This case is before the Court after remand by the Ninth

20  Circuit Court of Appeal.  The Ninth Circuit reversed the Court's

21  granting of Flagship West, LLC's and Marvin and Kathleen Reiche's

22  ("Flagship") election of rescission of its lease with Excel

23  Realty Partners, L.P. ("Excel") after a jury found that Excel

24  materially violated an "exclusive use" provision of the lease.

25  The trial court ruling that judicial estoppel precluded Excel

26  from asserting that § 4.5 of the lease bars rescission, was not

                              1

warranted and the limited remand was "so that the district court
may determine in the first instance whether the contract, in its
entirety, allows for rescission and whether California law would
give effect to the lease's limitations on remedies in these
circumstances." Specifically:

> Excel ... appeals the district court's order
> granting Excel's tenant ..., rescission of
> its lease based on a determination that Excel
> materially violated an 'exclusive use'
> provision of that lease.  The district court
> invoked judicial estoppel to prevent Excel
> from asserting that § 4.5 of the lease bars
> rescission.  Because we find judicial
> estoppel was not warranted here, we remand
> for the district court to determine whether
> rescission is an available remedy under
> California law and the terms of the contract.
>
> ...
>
> First, Excel's litigation positions were not
> clearly inconsistent.  There is no evidence
> that Excel ever conceded that rescission was
> available to Flagship.  Although the Pretrial
> Order did not specifically cite § 4.5 of the
> lease or discuss all of the arguments that
> might be based on the section, it
> acknowledged that Excel contested Plaintiffs'
> entitlement to rescind, at least on both
> materiality and independent covenant grounds.
> Other related arguments that rescission was
> not available, including the contractual
> limitation on remedies argument at issue,
> were adequately embraced within the order
> ....
>
> Second, the district court never relied on a
> party's inconsistent statements ... Even
> though the district court may have been under
> the impression that rescission was being
> 'actively litigated,' judicial estoppel is
> not appropriate unless the court made rulings
> in reliance on an admission by Excel that
> rescission was in fact available.  No such
> reliance is possible here because, throughout
> the proceedings, Excel actively contested the

2

availability of rescission on a theory-by-
theory basis.  Excel had no legal obligation
to pursue a general legal argument against
rescission prior to its more narrow arguments
because the argument regarding limitation of
remedies available under the contract is not
an affirmative defense under Fed. R. Civ. P.
8(c) ....

Third, allowing Excel to raise its
contractual remedies limitation argument
after the jury had deliberated did not give
Excel an unfair advantage or impose an unfair
detriment on Flagship.  Even if Excel had
raised the argument at an earlier stage, the
same factual issues would have been put to
the jury to determine liability for damages.

Consequently, we vacate the district court's
judgment awarding rescission damages to
Flagship and remand so that the district
court may determine in the first instance
whether the contract, in its entirety, allows
for rescission and whether California law
would give effect to the lease's limitations
on remedies in these circumstances.  We do
not reach either party's claims related to
the calculation of rescission damages and
express no opinion on those claims.

A supplemental scheduling conference was held.  The

Supplemental Scheduling Conference Order filed on August 14, 2009

(Doc. 499), states: "Plaintiff shall not raise any new matter in

the reply memorandum of law."

Flagship seeks interpretation of § 4.5 of the lease as not

precluding rescission of the lease.  Excel opposes Flagship's

motion.

A.   BACKGROUND.

Excel is the owner of the Briggsmore Plaza in Modesto.  On

July 16, 1998, Excel executed a 15 year ground lease ("Lease")

with Flagship, whose only members are the Reiches, for a stand-

alone 10,000 square foot lot (the "Property") in the Briggsmore
Plaza for the purpose of constructing and operating a buffet
style restaurant under the Golden Corral franchise (the
"Restaurant").   The Lease provides that Flagship has the
"exclusive right to operate a self service buffet style family
restaurant within the Shopping Center."  (Lease § 6.3).

To construct the Restaurant, Flagship borrowed a 25 year, $2
million loan from The Money Store, which was secured by a deed of
trust on Flagship's leasehold interest in the Property.  The
Reiches also executed written personal guarantees of the loan.
The Restaurant opened on June 10, 1999,  Approximately a year
later, the Four Seasons, a buffet restaurant serving Chinese
food, opened in the Briggsmore Plaza in a location directly
across from the Restaurant.  Based on an express lease provision,
Flagship contended that the operation of the Four Seasons
breached their exclusive right to run a buffet style restaurant
in the shopping center and caused the Restaurant to become
unprofitable, leading to its closure on April 1, 2001.

Flagship filed suit against Excel, alleging breach of
contract, fraud, and negligent misrepresentation, seeking
contract damages and rescission.  In the Pretrial Order, Flagship
requested a jury trial on all issues, while Excel relied on
Flagship's jury demand instead of making one themselves.  The
case was tried to a jury.  The trial commenced on November 12,
2003 and verdicts were returned on December 3, 2003.   The
general verdict with interrogatories found in favor of Flagship

4

and awarded Flagship $1,502,000.00 in contract damages.
Specifically, the jury found that Flagship proved "by a
preponderance of the evidence, that Defendant Excel Realty
Partners, L.P., breached the lease by leasing space in the
Briggsmore Plaza to Bi Wen Liu for the operation of the Four
Seasons Buffet" and Excel's "breach of paragraph 6.3 of the lease
agreement [was] material."  (Doc. 280).  Entry of judgment was
deferred to allow Flagship to elect the remedy of rescission and
any rescission damages or damages for breach of contract.

The "Order Re: Post Trial Election of Remedies; Defendants'
Claimed Rescission Waiver Clause; Defendants' Claimed Damage
Limitation Clause" filed on November 19, 2004 (November 19, 2004
Memorandum Decision; Doc. 353), notes the parties' extensive
post-trial briefing, addressing a number of issues.  Rescission
was elected and rescission damages awarded.  A remedies lease
provision barring rescission was found unenforceable.

B.  **FLAGSHIP'S MOTION FOR INTERPRETATION OF LEASE**.

The primary issue before the Court is the proper
interpretation of § 4.5 of the lease.[1]  Section 4.5 provides:

> 4.5 Triple Net Lease.  Tenant's Basic Rent
> and Additional Rent shall be absolutely net
> to Landlord, so that this Lease shall yield
> to Landlord the full amount of the
> installments of Basic Rent and Additional
> Rent throughout the Term, and shall be paid
> without assertion of any counterclaim, set

_____

[1]At the hearing, Excel asserted that the Ninth Circuit's
Memorandum remanding this case ruled that Section 4.5 constitutes
a limitation on Flagship's right to rescind the lease.  No such
ruling can be inferred from the Ninth Circuit's Memorandum.

off, deduction or defense and without abatement, suspension, deferment, diminution, reduction or refund of any kind, except as expressly set forth herein.  Under no circumstances whether now existing or hereafter arising, or whether beyond the present contemplation of the parties, shall Landlord be required to make any payment or refund of any kind whatsoever or be under any obligation or liability hereunder, except as expressly set forth herein.  Except as otherwise expressly set forth in this Lease, this Lease shall continue in full force and effect, and the obligations of Tenant hereunder shall not be released, discharged or otherwise affected, by reason of any of the following: (a) any damage to or destruction of the Premises or any portion of either or any Taking of the Premises or any portion of either; (b) any restriction or prevention of or interference with any use of the Premises or any portion of either; or (c) any other occurrence whatsoever, whether similar or dissimilar to the foregoing, in each case, whether or not Tenant shall have notice or knowledge of any of the foregoing. The obligations of Tenant in this Lease shall be separate and independent covenants and agreements.  Tenant hereby waives, to the fullest extent permitted by the applicable law, any and all rights now or hereafter conferred by statute or otherwise to quit, terminate or surrender this Lease or the Premises or any portion thereof, or to any abatement, suspension, deferment, diminution, reduction or refund of Basic Rent or Additional Rent, except as otherwise expressly set forth herein.

    1.   <u>Independent and Separate Covenants</u>.

Excel argues that rescission is barred because Flagship's obligations under the Lease are explicitly made separate and independent covenants by Section 4.5.  Excel refers to the "Order Re: Post Trial Election of Remedies; Defendants' Claimed Rescission Waiver Clause; Defendants' Claimed Damages Limitation

6

1  Clause," filed on November 19, 2004, (November 19, 2004

2  Memorandum Decision, Doc. 353), and specifically to 49:2-3 and

3  51:8-15:

> Plaintiffs were experienced and sophisticated
> restaurant operators.
>
> ...
>
> With respect to § 4.5, the Lease shows that
> the parties modified the provision, striking
> out the term 'or the Access Area' several
> times.  These changes were ratified by
> initials 'MGR' (Marvin G. Reiche) in the
> margins.  See Doc. 302, Ex. A, Lease, at 4.
> Plaintiffs cannot claim that § 4.5 escaped
> their notice.

11  Excel relies on these statements to assert that Section 4.5 was

12  bargained for between sophisticated parties at arm's length.

13  Therefore, Excel contends, Flagship cannot rescind or otherwise

14  avoid their obligations under the Lease based on a violation of

15  the exclusive use provisions in Section 6.3 of the Lease and

16  asserts that Flagship's sole remedy is damages for Excel's breach

17  of the exclusive use provisions.

18      Excel argues that it is unaware of any court that has

19  allowed rescission for breach of an exclusive use clause in a

20  lease that also provides that such clause is an independent

21  covenant.   Excel refers to the "Memorandum Decision and Order Re

22  Post-Trial Election of Remedies" filed on September 30, 2005

23  (September 30, 2005 Memorandum Decision, Doc. 362), at 14:13-17:

> Breach of an independent covenant does not
> warrant rescission because, by definition,
> breach of an independent covenant is not
> material.  By its very nature, an independent
> covenant does not run to the whole of the

7

1    consideration.

2        However, Excel's reference to the September 30, 2005

3  Memorandum Decision is incomplete:

4        Defendant asserts that materiality is not the
         central inquiry, and rather, the key inquiry
5        is whether the covenant breached is
         independent.  It is true that some courts
6        approach the question of rescission based at
         least in part on an analysis of whether the
7        provision breached was a dependent or
         independent covenant.  *See, e.g., Medico-*
8        *Dental,* 21 Cal.2d at 418-19; *Mills,* 56
         Cal.App. at 776.  This follows because the
9        factors that determine whether a covenant is
         independent, overlap with the factors that in
10       determine [sic] whether a breach was
         material.  *Medico-Dental,* 21 Cal.2d at 433.
11       Breach of an independent covenant does not
         warrant rescission because, by definition,
12       breach of an independent covenant is not
         material.  By its very nature, an independent
13       covenant does not run to the whole of the
         consideration.  However, what Defendant has
14       not provided is citation to any authority
         holding that exclusive use provisions, such
15       as the one at issue here, are independent
         covenants as a matter of law.  In fact, the
16       courts in the two cases upon which Defendant
         relies, *Kulawitz* and *Medico-Dental,* found
17       that the exclusive use covenants at issue
         there were dependent, based on an analysis of
18       the factors and the factual record.

19       In this case, the jury has already made a
         finding that the breach was material.  It is
20       not necessary for the court to now decide, as
         a matter of law, that the covenant at issue
21       was independent.  The provision was integral
         to the Lease, which would not have been
22       entered into without it.  The answer to the
         mixed question of law and fact as to
23       independence of the provision is irrelevant
         to the question whether the Plaintiff is
24       entitled to elect rescission.  The jury's
         finding of materiality provides sufficient
25       grounds for rescission, according to well-
         established California law.

26

                            8

(September 30, 2005 Memorandum Decision at 14:4-15:5).

Excel argues that *Kulawitz v. The Pacific Woodenware and Paper Co.*, 25 Cal.2d 664 (1944) and *Medico-Dental Bldg. Co. v. Converse*, 21 Cal.2d 411 (1942), "stand for a proposition that has no bearing on this case."   Excel contends that "[a]bsent an express statement in the lease that covenants are independent, a court may determine that the covenants involved are conditions precedent so that a breach may justify rescission if it goes to the heart of the matter."   Excel contends that such analysis is only necessary where there is no explicit agreement by the parties and is unwarranted here "because the Ground Lease specifies that Plaintiffs' obligations are independent of Excel's compliance with its obligations."   Excel asserts that the jury verdict of "material breach" during the breach of contract phase of the trial "does not overrule the clear tenant of California law that where the parties to a contract agree that the terms thereof are independent covenants, a breach will not justify rescission."

Excel's contention that Section 4.5 makes *Excel's* obligation to honor the exclusive use provisions of the Lease an independent covenant ignores the express wording of Section 4.5: Section 4.5 deals with a tenant's obligation to pay rent and provides that "[t]he obligations of Tenant in this Lease shall be separate and independent covenants and agreements."   Section 4.5 does not provide that any of the landlord's obligations under the Lease are independent covenants.   As Flagship asserts: "Defendants cite

9

no authority in support of their position, and without explanation assert that because the Lease states Tenant's obligations are 'independent covenants,' that the Landlord's obligations are independent as well."   Flagship cites *Medico-Dental*, *supra*, 21 Cal.2d at 419, in turn citing 32 Am.Jur. § 144, that "'covenants and stipulations on the part of the lessor and lessee are to be construed to be dependent upon each other or independent of each other, according to the intention of the parties and the good sense of the case, and technical words should give way to such intention.'" Flagship contends:

> Excel's interpretation patently ignores the circumstances of this case, the undisputed evidence that the exclusive use provision was central to the Lease, and the jury's finding of materiality, in arguing that a clause providing that the *Tenant's obligations* are independent also means the Landlord's obligations are independent.  In making this argument, Defendants are asking the court to read the word 'Landlord' into the provision, without any supporting evidence that that is what was intended by the parties.

Contrary to Excel's contention, Flagship argues, there is no "express statement" in the Lease making Excel's obligation to honor the exclusive use clause an independent covenant.  Flagship argues that Excel's interpretation of Section 4.5 allows Excel to treat every obligation it had under the Lease as optional, precluding Flagship from rescinding the Lease under any circumstances:

> Excel presents no support for its position that any party can be required to stay in a contract which the other party has materially failed to perform.  Without the consideration

Flagship expressly bargained for, the Lease failed.  The language making Flagship's covenants to pay rent 'independent' did not in way [sic] alter Defendants' obligation to honor the exclusive use provision, and does not make that provision any less central to the parties' bargain.

Excel argues that Section 6.3 of the Lease provides a remedy in damages for breach of the exclusive use clause.  Section 6.3 provides:

6.3 <u>Exclusive Use Rights</u>.  Subject to the conditions and restrictions set forth herein, Tenant shall have the exclusive right to operate a self service buffet style restaurant within the Shopping Center, except that such exclusive right:

...

(h) Shall not result in Landlord being liable to Tenant for monetary damages for any other tenants' or occupants' violation of such exclusive use privilege of Tenant unless, with respect to future tenants or occupants ..., Landlord has failed to restrict such tenant or occupant from violating Tenant's exclusive use privilege granted in this Lease ....

Flagship responds that Section 6.3(h) does not restrict the tenant from rescinding the Lease if Excel failed to prevent future tenants from violating Flagship's exclusive use privilege.  Flagship notes that Excel cites no authority that a damages provision limits the ability of a party to a contract from rescinding the contract because of a material breach.  Flagship cites California Civil Code § 1692, which provides that "[a] claim for damages is not inconsistent with a claim for relief based upon rescission."  Flagship refers to the November 19, 2004

11

1  Memorandum Decision that "[i]n the event rescission is elected, §

2  22.25 cannot be enforced as rescission avoids enforceability of

3  clauses of the Lease, including damage limitations."

4       Flagship's contentions are well-taken.  Section 4.5 by its

5  terms provides that the tenant's obligation to pay rent under the

6  lease is an independent covenant.  Section 4.5 does not refer in

7  any way to the landlord's obligations to the tenant under the

8  lease.  To the contrary, Section 6.3 imposes an express duty on

9  Excel to restrict any other tenant from violating Flagship's

10 exclusive use privilege.  This imposed an express obligation on

11 Excel which was integral to the lease and represented a dependent

12 covenant.  The jury specifically found that Excel's breach of the

13 exclusive use provision in Section 6.3 of the lease was material.

14 Excel's contention that the jury's verdict on this issue is

15 irrelevant to the determination that Section 4.5 makes Excel's

16 obligations under the lease independent covenants not only

17 ignores the verdict, which is now final, but ignores the plain

18 language of the lease, expressly imposing the duty on Excel to

19 protect the exclusive use right.

20            2.   Waiver of Section 4.5.

21      Flagship argues that Excel waived the defense of Section 4.5

22 by not presenting the issue to the jury and that Excel has the

23 burden of establishing that Section 4.5 operated as a waiver of

24 the right to rescind by clear and convincing evidence.

25      Excel rejoins that the Ninth Circuit "specifically ruled

26 that § 4.5 was not an affirmative defense (affirming this Court's

                              12

earlier ruling).”   The Ninth Circuit, in reversing the finding
of judicial estoppel, ruled that there was no evidence that the
Court relied on any inconsistent statement by Excel: “Excel had
no legal obligation to pursue a general legal argument against
rescission prior to its more narrow arguments because the
argument regarding limitation of remedies available under the
contract is not an affirmative defense under Fed. R. Civ. P.
8(c).”

In the November 19, 2004 Memorandum Decision, 40:3-41:26,
the Court addressed Flagship’s contention that Sections 4.5 and
22.25 were affirmative defenses that were waived by Excel by
failure to raise them in the Answer.   The discussion in the
November 19, 2004 Memorandum Decision is limited to contractual
limitation of damages clauses:

> With respect to contractual limitations on
> damages in a contract dispute, the defense is
> contained in the cause of action itself.
> Both sides had full access to the Lease (38
> pages long) and are presumed to have examined
> it carefully.   There is no danger of unfair
> surprise by assertion of this defense.

This discussion is limited to Section 22.25 of the Lease; it does
not address Section 4.5 as an affirmative defense. Excel relies
on the Ninth Circuit’s ruling to assert that it had no burden of
proof “with respect to this issue or other purported ‘waiver’
issues proffered by Plaintiffs.”   Excel contends that the burden
is on Flagship to prove their entitlement to rescission.

Flagship’s waiver argument is premised on the contention
that application of Section 4.5 to bar rescission is Excel’s

13

affirmative defense.  The Ninth Circuit's ruling resolves Flagship's position.[2]

Excel previously argued that "[i]n § 4.5 Plaintiffs have expressly waived the right to 'quit, terminate or surrender' the Lease 'except as otherwise expressly set forth herein' and there is not 'otherwise' in the Lease" and that Section 4.5 precludes rescission "' ... by reason of ... any restriction or prevention of or interference with any use of the Premises."

Flagship argues that Section 4.5's plain language reveals that it does not constitute a waiver of rescission.  Flagship notes that the term "rescission" does not appear in Section 4.5 and cites California case law in support of its contention that the terms "quit," "terminate," or "surrender" are not synonyms for rescission and have distinct unrelated meanings within the context of the Lease.

Flagship invokes principals of contract interpretation.

In California, "the intention of the parties as expressed in the contract is the source of contractual rights and duties.  A court must ascertain and give effect to this intention by determining what the parties meant by the words they used." *Pacific Gas and Electric Co. v. G.W. Thomas Drayage & Rigging Co., Inc.*, 69 Cal.2d 33, 38 (1968).  "The precise meaning of any

---

[2]The Ninth Circuit's ruling makes unnecessary any discussion of Flagship's contention that Excel waived the right to contest rescission by failing to present the issue to the jury and establishing that Section 4.5 operated as a waiver of rescission by clear and convincing evidence.

contract ..., depends upon the parties' expressed intent, using an objective standard."  As explained in *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 18-19 (1995):

> The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties.  'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Civ.Code, § 1636.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [*Id.,* § 1639.] The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*id.,* § 1644), controls judicial interpretation ... A [contract] provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable ... But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract ... Courts will not strain to create an ambiguity where none exists.

"Interpretation of a contract 'must be fair and reasonable, not leading to absurd conclusions'" and a court "'must avoid an interpretation which will make a contract extraordinary, harsh, unjust, of inequitable.'"  *ASP Properties Group v. Fard, Inc.*, 133 Cal.App.4th 1257, 1269 (2005):

> Section 1643 provides: 'A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties.'  In the event other rules of interpretation do not resolve an apparent ambiguity or uncertainty, 'the language of a contract should be interpreted

> most strongly against the party who cause the
> uncertainty to exist.'   (§ 1654).

*Id.*

Flagship argues that, applying these rules of contract interpretation, Section 4.5 cannot be reasonably interpreted as a waiver of its right to rescind or as precluding rescission in any way.  Flagship contends that Excel waived the right to argue that extrinsic evidence should be considered in interpreting the Lease because it did not present extrinsic evidence at trial concerning the meaning of the Lease or request findings of fact by the jury through special interrogatories.

Flagship contends that the plain language of Section 4.5 does not constitute a waiver of its right to rescind.[3]

Flagship asserts the word "terminate" is not synonymous with "rescission."  Flagship cites *Welles v. Turner Entertainment Co.*, 503 F.3d 728 (9th Cir.2007).  In *Welles*, the daughter of Orson Welles sought a declaratory judgment that she owned the copyright and home video rights to "Citizen Kane," an accounting of royalties, and for alleged breach of contract and unfair business practices.  In pertinent part, the Ninth Circuit ruled:

> As noted above, the Exit Agreement stated
> that it was 'the mutual desire of the parties
> to terminate and cancel' their prior
> agreements.  Beatrice Welles argues that this
> language rescinded the parties' prior
> agreements and thus returned any right Orson

---

[3]**Flagship requests the Court take judicial notice of various definitions of "rescission," or "rescind," "quit," "terminate" and "surrender" set forth in various recognized dictionaries.  *See* Doc. 501.**

Welles and Mercury had in the *Citizen Kane* motion picture to them.  However, under California law, it seems that 'terminate' and 'cancel' mean something different from 'rescind':

> The words "terminate," "revoke," and "cancel," ... all have the same meaning, namely, the abrogation of so much of the contract as might remain executory at the time notice is given, and must be sharply distinguished from the word "rescind," ... which conveys a retroactive effect, meaning to restore the parties to their former position.

*Grant v. Aerodraulics Co.,* 91 Cal.App.2d 68 ... (1949).  Thus, under California law, the Exit Agreement prospectively terminated and cancelled Orson Welles's right to royalties, but did not retroactively rescind RKO's copyright in the *Citizen Kane* motion picture unless RKO's copyright remained executory at the time of the Exit Agreement.

503 F.3d at 738.  *See also Sanborn v. Ballanfonte,* 98 Cal.App. 482, 488 (1929).

Flagship argues that the Lease uses the word "terminate" consistently with its definition under California law as explained in *Sanborn* and *Grant*.  Flagship refers to Section 18.2 of the Lease, captioned "Remedies:"

> (a) If an Event of Default shall occur, then, in addition to any other remedies available to Landlord at law or in equity, Landlord shall have the right to immediately terminate this Lease, and to recover from the Tenant the following:

> (1) the worth at the time of award of the unpaid Basic Rent, Additional Rent, and other sums owing by Tenant under this Lease (collectively 'Rent') which had been earned at the time of termination;

17

                    **(2) the worth at the time of award
          of the amount by which the Unpaid Rent would
          have been earned after termination until the
          time of award exceeds the amount of such
          rental loss that Tenant proves could have
          been reasonably avoided.**

          **....**

**Flagship also refers to Section 6.4 of the Lease, captioned
"Cessation of Business:"**

          **If, after the Commencement Date, Tenant
          ceases business from the Premises for a
          period of one hundred eighty (180) days in
          any sixty (60) month period, Landlord shall
          have the option, by written notice to Tenant,
          to terminate this Lease as of the date set
          forth in such notice, which date shall not be
          earlier than thirty (30) days after the date
          of such notice.  In the event Landlord elects
          to terminate this Lease as described above,
          this Lease shall be null and void and of no
          further force or effect on the date set forth
          for such termination, except that accrued but
          unpaid or unperformed obligations shall
          continue in effect; provided, however, that
          Landlord shall pay to Tenant on the effective
          termination date the unamortized cost
          incurred by Tenant for the construction of
          the improvements ....**

**Flagship refers to Section 15 of the Lease, captioned "Eminent
Domain," and specifically Sections 15.1(a) ("In the event of a
Total Taking of the Premises, the Lease shall terminate as of the
date of the Taking ...") and 15.2(a) ("If a Partial Taking
results [in specified loss of parking or premises], then Tenant
may, at Tenant's option, terminate this Lease in its entirety as
of the date of the Taking, in which case Landlord and Tenant
shall be released from all further obligations and liability
under the Lease ...").  Flagship argues that interpretation of**

                                    18

the word "terminate" in Section 4.5 to have a different meaning from these Lease provisions violates a basic premise of contract interpretation law.  *See E.M.M.I. Inc. v. Zurich American Ins. Co.*, 32 Cal.4th 465, 475 (2004):

> Accepting Zurich's interpretation would require that we give different meanings to the same term used in the same policy paragraph.  This would run afoul of the rule of contract interpretation that the same word used in an instrument is generally given the same meaning unless the policy indicates otherwise.

Flagship also contends that the term "surrender" is not synonymous with "rescission."  Flagship cites *Scott v. Mullins*, 211 Cal.App.2d 51, 55 (1962):

> A surrender is a yielding up of an estate for life or years to the reversioner or remainderman.  A surrender yields the estate as distinguished from the possession and can be accomplished by express consent of the parties in writing, or by operation of law when the parties do something which implies they have consented.

"In landlord-tenant law, surrender exists when the tenant voluntarily gives up possession of the premises prior to the full term of the lease and the landlord accepts possession with intent that the lease be terminated."  *Black's Law Dictionary* at 1444 (6th ed.1990).

Flagship also contends that the term "surrender" in the Lease is used consistently with the definition under California law.  Flagship refers to Section 22.5 of the Lease, captioned "Removal of Trade Fixtures During Term; Delivery at End of Term:"

> At any time during the Term of the Lease,

19

> Tenant may remove from the Premises any trade
> fixtures, machinery or equipment belonging to
> Tenant or third parties, provided Tenant
> shall repair any damage to the Premises
> caused by such removal.  Upon expiration or
> earlier termination of this Lease, Tenant
> shall surrender the Premises ... and all
> portions thereof, to Landlord in good order,
> condition and repair ....

Section 22.11 of the Lease, captioned "Modification; Acceptance of Surrender," provides:

> No modification, amendment, termination or
> surrender of this Lease or surrender of the
> Premises or any portion thereof or of any
> interest therein by Tenant shall be valid or
> effective unless agreed to and accepted in a
> writing signed by Landlord, and no act by any
> representative or agent of Landlord, other
> than such a written agreement and acceptance
> by Landlord, shall constitute an agreement
> thereto or acceptance thereof.

Flagship argues that the term "quit" is not synonymous with rescission.  Flagship cites *Grand Central Public Market v. Kojima*, 11 Cal.App.2d 712, 717 (1936).  In *Kojima*, the landlord sent two three day notices to its tenant to pay rent or quit.  The notices were ignored by the tenant and not acted upon by the landlord and expired by their terms.  The landlord then sent the tenant a letter stating that if back rent was not paid, the landlord would commence suit to remove the tenant from the premises.  The landlord sued the tenant, who quit the premises the day after the suit was filed.  The tenant argued that it was not liable for the rent for the month of January, because the lease terminated when he quit the premises.  The Court of Appeal ruled:

20

1
2
3
4
5
6
7
8
9
10
11

> The lease is terminated only if the notice is
> acted upon by one of the parties.  If the
> lessor had brought an unlawful detainer suit
> based upon the notices to quit, as they were
> framed in this case, then the court trying
> such unlawful detainer action would, upon a
> proper showing, have the undoubted right to
> decree a forfeiture of the lease ... Or, if
> the lessee within the three-day period
> specified in the notices had quit the
> premises, the respective lease would have
> been forfeited by agreement of the parties,
> since the lessee would be in the position of
> accepting lessor's offer to terminate the
> same ... Neither of these methods was
> followed or taken advantage of by either of
> the parties.  When a lessor, as did the
> lessor in this case, claims or collects rent
> in an action, or otherwise, as the result of
> a legal proceeding, or otherwise, he waives
> his existing right to effect a termination.

12  Flagship relies on this to argue that the physical act of

13  quitting the premises in and of itself does not effect

14  termination of a lease: "Similarly, prohibition on 'quitting' the

15  premises or a waiver of one's right to 'quit' the premises in no

16  way could be interpreted as a waiver of one's right to rescind

17  the lease."

18      Excel responds that Flagship's "hyper-technical argument"

19  based on the definitions of "terminate," "surrender" or "quit"

20  does not address the meaning of Section 4.5 as a whole.  Excel

21  asserts that Flagship's "convoluted argument boils down to the

22  contention that because § 4.5 does not contain the word

23  'rescission,' rescission is not barred."  Excel refers to the

24  November 19, 2004 Memorandum Decision discussing the effect of

25  rescission on contractual clauses at 41:18-44:25:

26      With respect to § 4.5, Defendants cite a

21

California Court of Appeals opinion which states an alternate holding for denying rescission:

> In plaintiffs' closing brief, not before, our attention was drawn to a provision contained in the subcontract agreement of plaintiff ...: 'Subcontractor, in the event of any dispute or controversy with Contractor or any other subcontractor over any matter whatsoever, shall not cause any delay or cessation in or of Subcontractor's work or the work of any other subcontractor or of the Contractor but shall proceed under this Subcontract Agreement with the performance of the work required thereby.'
>
> The quoted clause bound [Subcontractor] to finish its work regardless of any dispute with [Contractor].  In effect, the clause was an advance waiver of any right to rescind after partial performance.  The net result of the clause was to make a breach of contract action the subcontractor's exclusive remedy.  (Nelson v. Spence, 182 Cal.App.2d 493, 497 ...; 5A Corbin on Contracts, § 1227; 17A C.J.S., Contracts, § 422[1], p. 521, fn. 62.).  Having committed itself to complete performance, [Subcontractor] was confined to the remedy and to make the scale of damages available to one who has completed his contract notwithstanding a breach by the other party - suit on the contract and recovery by the scale of damages which the law applies in such suits.

*B.C. Richter Contracting Co. v. Continental Casualty Co.,* 230 Cal.App.2d 491, 500-501 (Cal.Ct.App. 1964).  The provision waiving rescission was applicable even though it was first noticed on appeal after the completion

22

of a bench trial.  The cited provision does not mention the term 'rescission' and was found to be a valid waiver of that remedy. Its language is comparable to § 4.5.

The opinion upheld a valid anti-rescission clause, although rescission would void the effect of all other contractual clauses.  The cases Plaintiff cite to the contrary do not negate the ability to waive the remedy of rescission.  See e.g. *Guerini Stone Co. v. P.J. Carlin Constr. Co.*, 248 U.S. 334, 341 (1919) (subcontractor properly terminated contract when project was indefinitely delayed; 'the 11th paragraph of the sub-contract, providing: "The general contractors will provide all labor and materials not included in this contract in such manner as not to delay the material progress of the work, and in the event of failure so to do, thereby causing loss to the sub-contractor, agree that they will reimburse the sub-contractor for such loss," as applied to the facts of the case, imported an agreement by defendant to furnish the foundation in such manner that plaintiff might build upon it without delay, and was inconsistent with an implication that the parties intended that delays attributable to the action of the owner should leave plaintiff remediless'); *Gally v. Wynne*, 96 Cal.App. 145, 147 (Cal.Ct.App. 1929) (the contract provision in question stated 'In the event I violate any part of this agreement I agree to deduct $500 from the purchase price of $3500,' which is not an anti-rescission clause); *Dyer Bros. Golden West Iron Works v. Central Iron Works*, 72 Cal.App. 202, 207 (Cal.Ct.App.1925) (both parties breached the contract, voiding the liquidated damages clause).

The *B.C. Richter* holding cited by Defendants has been affirmed by more recent opinions. See *Fosson v. Palace (Waterland), Ltd.*, 78 F.3d 1448, 1455 (9th Cir.1996) ('Fosson admitted that he read and understood the Synch License provision in which he waived his right to rescind or terminate the agreement .... Thus, Fosson has no right to rescind as a matter of law by virtue of his waiver.'); *Michel & Pfeffer v. Oceanside*

23

> *Properties, Inc.,* (1976) 61 Cal.App.3d 433,
> 442 (specifically distinguishing *Guerini* as
> not mandating the performance of the
> contract, hence no waiver of rescission).
> These cases affirm the general enforceability
> of an anti-rescission clause.

Excel asserts that Flagship cites no authority that requires the explicit use of the term "rescission" in order to bar rescission as a remedy.  Excel contends the result reached in *B.C. Richter* should apply here, "because all facets of rescission are barred by § 4.5."

Flagship replies that Excel's reliance on *B.C. Richter* and the November 19, 2004 Memorandum Decision is misplaced.  Flagship contends that Excel argued to the Ninth Circuit on appeal that the Court correctly determined that Section 4.5 barred rescission based on *B.C. Richter* and the other cases cited in the November 19, 2004 Memorandum Decision.  Excel contended on appeal that, had it not been for the finding of judicial estoppel, Section 4.5 would have prevented rescission.  The Ninth Circuit remanded "so that the district court may determine in the first instance whether the contract, in its entirety, allows for rescission and whether California law would give effect to the lease's limitations on remedies in this circumstances."  Implicit in these instructions, Flagship contends, is a rejection of Excel's position that *B.C. Richter, Fosson,* and *Michel & Pfeffer* require, as a matter of law, that Section 4.5 be interpreted as a waiver of rescission."

Flagship argues that the circumstances of the cases on which

24

Excel relies are different from the facts of this case: "[n]either *B.C. Richter, Fosson*, nor *Michel & Pfeffer* involved a landlord's undisputed material breach of a 25 year ground lease a year after the lease commenced."

In *Fosson* a composer brought a copyright infringement action against movie producers and a financing company. The District Court granted summary judgment for defendants. On appeal, the Ninth Circuit addressed the circumstances under which a subsequent breach of an express license, which may constitute grounds for rescission, can give rise to a suit for infringement by the licensor. Flagship argues that *Fosson* is distinguishable because there, the remedies limitation clause specifically provided that the licensor "shall not have any right to terminate or rescind this Agreement" and because Fosson admitted that he read and understood the agreement. Flagship notes that Section 4.5 does not mention the term "rescission" and contends that there is no testimony in this action regarding any party's understanding of Section 4.5.

In *Michel & Pfeffer*, a subcontractor on a building project brought an action against the contractor, the contractor's surety, and the property owners for payment on a bond, foreclosure of a mechanic's lien, and a common count based on work performed. Flagship contends: "These circumstances alone point to why remedies' limitation clauses in construction contracts may be generally enforced, as the subcontractor has both the security of the bond and mechanics lien statutes to

secure payment for his work done."  Flagship asserts that also at issue in *Michel & Pfeffer* was a delay of the subcontractor's work caused by the contractor.  The contract provided that an extension of time for delays "shall be the sole remedy of Subcontractor."  Flagship argues that *Michel & Pfeffer* is distinguishable because Section 4.5 does not provide for any sole remedy for the landlord's breach and does not reference or otherwise pertain to the landlord's obligation to honor Flagship's exclusive use rights.

*B.C. Richter* involved actions by subcontractors on the prime contractor's surety bond for quantum meruit recovery to be measured by the reasonable value of unpaid labor and materials. The trial court ruled that the subcontractors' recovery was limited to the unpaid remainder of the contract price.  On appeal, the subcontractors argued that the breaches and defaults by the contractor entitled them to forego the contract price as the strict measure of liability, permitting recovery by the more generous scale of quantum meruit or reasonable value.  The Court of Appeal ruled:

> Plaintiffs' thesis rests upon misconceptions
> of contract law and misuse of the phrase
> 'quantum meruit.'  The general rule in
> California is '" ... one who has been injured
> by a breach of contract has an election to
> pursue any of three remedies, to wit: 'He may
> treat the contract as rescinded and may
> recover upon a quantum meruit so far as he
> has performed; or he may keep the contract
> alive, for the benefit of both parties, being
> at all times ready and able to perform; or,
> third, he may treat the repudiation as
> putting an end to the contract for all

purposes of performance, and sue for the profits he would have realized if he had not been prevented from performing.'"' ... When, after partial performance, the innocent party elects to disaffirm or rescind, there is no longer any contract which conclusively fixes a limit upon his recovery; hence, it is said, he may sue upon a quantum meruit as if the special contract had never been made and may recover the reasonable value of the services performed, even though recovery exceeds the contract price ....

If the innocent party chooses to rescind, he must do so promptly upon discovery of the breach ... He may not wait to see whether the contract turns out to be profitable or unprofitable, good or bad ....

Where his performance is not prevented, the injured party may elect instead to affirm the contract and complete performance.  If such is his election, his exclusive remedy is an action for damages ... Affirmation of the contract, on the one hand, and rescission and restitution on the other, are alternative remedies.  Election to pursue one is a bar to invoking the other ....

In plaintiffs' closing brief, not before, our attention was drawn to a provision contained in the subcontract agreement of plaintiff B.C. Richter Contracting Company, but not in the subcontract of R. & E. Materials Company: 'Subcontractor, in the event of any dispute or controversy with Contractor or any other subcontractor over any matter whatsoever, shall not cause any delay or cessation in or of Subcontractor's work or the work of any other subcontractor or the Contractor but shall proceed under this Subcontract Agreement with the performance of the work required thereby.'

The quoted clause bound Richter to finish its work regardless of any dispute with Hayes-Cal Builders.  In effect, the clause was an advance waiver of any right to rescind after partial performance ... Having committed itself to complete performance, Richter Contracting was confined to the remedy and to

27

the scale of damages available to one who has
completed his contract notwithstanding a
breach by the other party - suit on the
contract and recovery by the scale of damages
which the law applies in such suits ....

On the assumption that Hayes-Cal was guilty
of hindrances and defaults amounting to a
breach of contract conditions, the other
plaintiff, R. & E. Materials Company, had an
election to rescind promptly or to stand on
its contract and continue performance.
Choice of the first alternative would have
permitted R. & E. Materials to sue in quantum
meruit for the reasonable value of partial
performance, less any sums paid.  The joint
venture did not choose that alternative.  The
trial court correctly concluded that it lost
all right to rescind by failing to do so
promptly after the cessation of progress
payments.  It is equally accurate to say that
it elected not to repudiate the subcontract,
but to affirm it and continue performance.
Having chosen the second alternative, it was
then barred from repudiation and pursuit of
reasonable value.

Thus, when both plaintiffs argue on appeal
for 'quantum meruit' unlimited by the
contract price, they speak in terms not
available to them.  Their remedy was that
imposed upon them, in the one case, by the
contract and in the other by their election
to perform: to sue for the unpaid balance of
the contract price plus extra costs caused by
hindrances and delay.

230 Cal.App.2d at 499-501.

Flagship asserts that the court in *B.C. Richter* did not find
that the remedies provision barred rescission outright.  *B.C.
Richter* ruled that the "clause bound Richter to finish its work
regardless of any dispute with Hayes-Cal Builders" and that
"clause was an advance waiver of any right to rescind after
partial performance."  230 Cal.App.2d at 501.  Flagship contends

28

that *B.C. Richter* does not support interpreting Section 4.5 as a waiver of Flagship's right to rescind, particularly in light of the fact that in *B.C. Richter*, there was no material breach by the other contracting party that thwarted performance.   Flagship asserts:

> Significantly, B.C. Richter had *completed the contract* and then sought to rescind the contract.  (*Id.* at 502.)  The court found that under these circumstances, the subcontractor had waived its right to rescind.

Flagship cites *Seaboard Surety Co. v. United States*, 355 F.2d 139, 143 (9th Cir.1966), where the Ninth Circuit, in discussing *B.C. Richter*, stated that "[t]he subcontractors had a right to rescind after the cessation of certain progress payments, but elected to proceed with contract and completed performance."

Flagship also cites *Barton Properties, Inc. v. Superior Gunite Co.,* 2006 WL 541025 at *7 (Cal.Ct.App.2006).

The dispute in *Barton Properties* was over paragraph 35 of a construction contract:

> 35.   In the event of a dispute between the parties as to performance of the work, the interpretation of this contract, extra work, delay, disruption, or payment or nonpayment for work performed, the parties shall attempt to resolve the dispute by negotiation.   If the dispute is not resolved, *Contractor agrees to Continue the work diligently to completion and will neither rescind nor stop the progress of the work, but will submit such controversy to determination by a court of competent jurisdiction after the project has been completed.*

*Id.* at *5.   The Court of Appeal, citing California Civil Code §

1511 and *Peter Kiewit Sons' Co. v. Pasadena Junior College*, 59

Cal.2d 241 (1963), that an owner who is a party to a construction

contract is a creditor, ruled:

> We conclude that where a general contractor
> (Barton Properties) *materially* breaches a
> contract so as to delay or prevent the
> performance of the subcontract (Superior
> Gunite) the subcontractor is not foreclosed
> from refusing to perform and rescinding the
> contract by reason of a contractual
> provision, such as paragraph 35, which
> requires a contractor not to rescind the
> contract or stop working but instead to
> 'continue the work diligently to completion'
> and then 'submit [any] controversy
> [regarding]' 'performance of the work, the
> interpretation of this contract, extra work,
> delay, disruption, or payment or nonpayment
> for work performed' 'to determination by a
> court of competent jurisdiction after the
> project has been completed.'  A contrary
> conclusion would impermissibly conflict with
> the controlling plain language of section
> 1511, paragraph 1 ....
>
> Barton Properties acknowledges the existence
> of this conflict.  Its position is that the
> 1965 amendment to section 1511, paragraph 1
> 'added [a] clause permitting ... provisions'
> such as paragraph 35.
>
> We note Barton Properties has cited no
> applicable authority in support of its
> position that contractual provisions such as
> paragraph 35 are authorized under section
> 1511, paragraph 1.  Its reliance is misplaced
> on *B.C. Richter Contracting Co. v.
> Continental Cas. Co.* (1964) 230 Cal.App.2d
> 491 ... and *Michel & Pfeffer v. Oceanside
> Properties, Inc.* (1976) 61 Cal.App.3d 433.
> Neither case addressed section 1511,
> paragraph 1, much less its impact on a
> contractual provision such as paragraph 35
> ....

*Id.* at *6.   The Court of Appeal then addressed Barton Properties'

contention that it was prejudiced by a jury instruction that it

contended negated paragraph 35.  In so ruling, the Court of

Appeal stated:

> And *B.C. Richter* is factually inapplicable
> and thus fails to support Barton Properties's
> position.  As discussed above, *B.C. Richter*
> did not involve section 1511, paragraph 1 or
> its applicability to paragraph 35 or a
> similar contract provision, and its comments
> regarding such a provision were dicta.  The
> court did not discuss whether section 1511,
> paragraph 1 rendered unenforceable a contract
> provision like paragraph 35.  In [*B.C.
> Richter*], two subcontractors sued in quantum
> meruit for an amount greater than the
> contract price on the theory they were
> entitled to rescind the contract ... Their
> exclusive remedy, however, was for breach of
> contract because they affirmed the contract
> by completing their performance ... The *B.C.
> Richter* court characterized a clause in the
> contract of one subcontractor, which required
> it to complete its performance
> notwithstanding any dispute with the
> contractor, to be an 'advance waiver of any
> right to rescind after partial performance[,
> which meant] a breach of contract action
> [was] the subcontractor's exclusive remedy.'
> ... But this was dicta because the trial
> court did not make any factual findings that
> the contractor had hindered the
> subcontractor's performance, and the
> subcontractor had performed completely.

*Id.* at *7.

Barton Properties* is not controlling.  California Civil Code
§ 1511 provides:

> The want of performance of an obligation, or
> an offer of performance, in whole or in part,
> or any delay therein, is excused by the
> following causes, to the extent to which they
> operate:
>
> 1.  When such performance or offer is
> prevented or delayed by the act of the

31

creditor, or by the operation of law, even
though there may have been a stipulation that
this shall not be an excuse; however, the
parties may expressly require in a contract
that the party relying on the provisions of
this paragraph give written notice to the
other party or parties, within a reasonable
time after the occurrence of the event
excusing performance, of an intention to
claim an extension of time or of an intention
to bring suit or any other similar or related
intent, provided that the requirement of such
notice is reasonable and just ....

As Excel notes, Flagship and Excel were tenant and landlord.
Flagship makes no showing or argument that it was a creditor
within the meaning of Section 1511.

The rules of contract construction support Flagship's
position that Section 4.5 is not a waiver of rescission; the
unavailability of rescission is never mentioned in Section 4.5
and no evidence was presented that the parties intended that
rescission of the lease be precluded based on Excel's material
breach of the lease.  Moreover, *B.C. Richter* and related cases
contain continual performance obligations, despite an event of
breach, which is the basis for a waiver of the right to rescind.
Section 4.5 is expressly subject to exceptions "otherwise
expressly set forth herein."  Section 6.3 is such an express
exception.

3.   <u>Rescission Voided Entire Lease</u>.

Flagship argues that, because it rescinded the Lease, the
entire Lease, including Section 4.5, is extinguished and cannot
be enforced.

California Civil Code § 1688 provides that "[a] contract is

32

extinguished by rescission."  "Rescission of a contract must be
of the contract as a whole and not in part.  It is the undoing of
a thing and means that both parties to the contract are entirely
released as if it had not been made."  *Douglas v. Dahm*, 101
Cal.App.2d 125, 128 (1950).  Flagship refers to the November 19,
2004 Memorandum Decision at 41:28-42:17, where the Court
discussed the effect of rescission on contractual clauses:

> Plaintiffs are correct in stating that
> rescission would void ordinary contractual
> clauses such as § 22.25.  Once a contract is
> rescinded, all its provisions cease to have
> effect.  See *Larsen v. Johannes,* 7 Cal.App.3d
> 491, 501 (Cal.Ct.App. 1970) (citing *Lemle v.
> Barry*, 181 Cal. 1, 5 (Cal.1919)).  ('When a
> contract is rescinded, it ceases to exist.
> If the action to rescind or an action based
> on an alleged rescission or abandonment is
> successful, the contract is forever ended and
> its covenants cannot thereafter be enforced
> by any action').  In an unpublished state
> court opinion, an analogous question was
> posed: 'The issue presented is elemental –
> may a defendant resist an action for
> rescission by relying on a liquidated damages
> provision of the contract the plaintiff is
> seeking to rescind?  The answer is equally
> simple – no.' *BTS, Inc. v. Sonitrol Corp. of
> Contra Costa,* No. 1093591, 2002 WL 234889
> (Cal.App. 1 Dist., Feb. 19, 2002) ('rescinded
> contract is an extinguished contract meaning
> that it has ceased to exist and none of its
> provisions can be enforced by any party').

    Excel responds that Flagship's position evades "the point
entirely: § 4.5 bars rescission from the outset, so what *might*
happen *if* Plaintiffs *could* rescind is meaningless."  Excel
asserts that Flagship's "circular argument" was rejected by the
Court in the November 19, 2004 Memorandum Decision discussing the
effect of rescission on contractual clauses quoted above.  This

33

is belied by the express exceptions included in Sections 4.5 and 6.3, which suspend the Lessor's remedies upon occurrence of the condition of the exception; to wit, Excel's violation of Flagship's exclusive use rights.

**4.   Context of Lease as a Whole Does Not Support Interpreting Other Portions of Section 4.5 as Waiver of Right to Rescind.**

Flagship argues that, looking to the Lease as a whole, Section 4.5 cannot be interpreted as a waiver of the right to rescind.  Flagship notes that Section 4 of the Lease is captioned "Rent."  The provisions of Section 4 are specifically directed at the Tenant's obligations to pay rent: Section 4.1 sets out the preliminary rent Flagship was obligated to pay from the time it entered into the Lease until the Golden Corral Restaurant opened for business; Section 4.2 sets out the basic rent after the restaurant opened; Section 4.3 provided for the amount of rent during the five-year option periods; Section 4.4 obligated Flagship to pay additional rent on demand; Section 4.6 provided Landlord the right to assign rent payments.  Flagship argues that within the context of these provisions, Section 4.5, captioned "Triple Net Lease," provides what Excel would net from the rental payments.  Flagship cites 6 Matthew Bender, California Real Estate Law & Practice, § 154.10[1], that a triple net lease provision assures the Landlord that "the tenant pays the taxes, the insurance, costs of repair, and costs of maintenance."

Flagship argues that Section 4.5 is a standard triple net lease provision which entitles the Landlord to rent net of these costs and "is essentially a financing device that gives the tenant the advantages of ownership without the investment of capital or direct obligation under a deed of trust and gives the owner of the property a return of his or her investment without the active responsibilities of investment management." *Id.*

Flagship refers to the portion of Section 4.5 providing:

> ***Except as otherwise expressly set forth in this Lease***, this Lease shall continue in full force and effect, and the obligations of Tenant hereunder shall not be released, discharged or otherwise affected, by reason of any of the following: (a) any damage to or destruction of the Premises or any portion of either or any Taking of the Premises or any portion of either; (b) any restriction or prevention of or interference with any use of the Premises or any portion of either; or (c) any other occurrence whatsoever, whether similar or dissimilar to the foregoing, in each case, whether or not Tenant shall have notice or knowledge of any of the foregoing. [Emphasis added].

Flagship argues that nothing in this language can be interpreted as a waiver of Flagship's right to rescind:

> On its face, the language deals with physical interference or restrictions and is facially not applicable to the material breach of the lease at issue in this case. By definition, the provision provides that the lease would continue in force notwithstanding the occurrence of a condition subsequent. Specifically, there is no language contained within Section 4.5 that could reasonably be interpreted as a limitation on a tenant's right to rescind.

Flagship argues that the purpose of the provision in Section

4.5 that

> Tenant's Basic Rent and Additional Rent shall
> be absolutely net to Landlord, so that this
> Lease shall yield to Landlord the full amount
> of the installments of Basic Rent and
> Additional Rent throughout the Term, and
> shall be paid without assertion of any
> counterclaim, set off, deduction or defense
> and without abatement, suspension, deferment,
> diminution, reduction or refund of any kind,
> *except as expressly set forth herein*,
> [emphasis added]

is "to preclude a tenant from interposing a counterclaim in any action or proceeding brought by the landlord for rent, or for possession based on nonpayment," quoting 1 Friedman on Leases § 5:1.2[A] (5th ed. 2009).  Flagship asserts that "[t]his interpretation flows from the language of the sentence, which uses the words, 'counterclaim, set off, deduction, or defense,' and does not use the words typically associated with offensive action, such as 'cause of action' 'claims' etc."  Flagship argues that this portion of Section 4.5 should be contrasted with Section 12.1, captioned "General Indemnity:"

> Tenant shall protect, indemnify, defend and
> hold Landlord ... harmless from and against
> any and all liabilities, obligations, claims,
> damages, penalties, causes of action,
> judgments, costs and expenses ... incurred by
> or asserted against Landlord ... during the
> Term hereof, arising in connection with or
> resulting from (a) this Lease; (b) any
> accident or injury to or death of persons or
> loss of or damage to property occurring on or
> about the Premises or any portion thereof;
> (c) any use or condition of the Premises or
> any portion thereof; (d) any failure by
> Tenant to perform or comply with any terms of
> this Lease, or (e) any negligence, willful
> misconduct or tortious act or omission on the
> part of Tenant or any Subtenant ... If any

1     action, suit or proceeding is brought against
      Landlord ... by reason of any of the
2     foregoing, Tenant, upon Landlord's request,
      shall, at Tenant's sole cost and expense,
3     defend such action, suit or proceeding with
      counsel designated by Landlord.  The
4     obligations of Tenant under this Paragraph
      shall survive the expiration or earlier
5     termination of this Lease.

6 Flagship, noting that Section 12.1 uses the terms "any and all

7 liabilities, obligations, claims, damages, penalties, causes of

8 action, judgments, costs and expenses," argues that "[u]nder the

9 rule of construction that the expression of one thing is the

10 exclusion of another, and in light of Section 4.5's use of the

11 words typically associated with defenses, such as 'set off,

12 deduction, defense, abatement, counterclaim' etc., this sentence

13 cannot be interpreted as applying to offensive claims that

14 Flagship would have against Defendants for their breach of the

15 Lease."   Flagship cites *Steven v. Fidelity & Cas. Co. of New*

16 *York,* 58 Cal.2d 862, 870 (1962):

17     The crucial issue resolves into whether the
      limitation of that extension to 'land
18     conveyances' sufficiently overcomes the
      normal expectation that coverage would extend
19     to *any reasonable form of substitute
      conveyance.*  The clause clearly does not
20     specifically *exclude* substitute emergency
      aircraft; it does not mention nonland
21     conveyances at all.  An inference of such
      noncoverage could arise only with the aid of
22     the rule of construction *expressio unius est
      exclusio alterius*: i.e., that mention of one
23     matter implies the exclusion of all others.

24     We do not believe the application of the
      maxim can resolve the present case.  The
25     maxim serves as an aid to resolve the
      ambiguities of a contract.  If we invoke the
26     *expressio unium* approach, we must necessarily

> thereby recognize the ambiguity of the
> contract; in that event other legal
> techniques for the resolution of ambiguities,
> including the rule that they should be
> interpreted against the draftsman, also come
> into play.  Thus *McNee v. Harold Hensgen &
> Associates* (1960) 178 Cal.App.2d 86l ...
> holds that if the applicability of a contract
> provision can be determined only by use of
> the maxim *expressio unius*, the contract is
> ambiguous, and extrinsic evidence is
> therefore admissible to prove the intent of
> the parties.

Flagship further asserts that the "and shall be paid" clause of Section 4.5 refers only to the payment of rent by Flagship and, standing alone, cannot be construed as a waiver of any right to rescind the Lease based on Excel's breach of the exclusive use provision.

Finally, Flagship refers to the portion of Section 4.5: "Under no circumstances whether now existing or hereafter arising, or whether beyond the present contemplation of the parties, shall Landlord be required to make any payment or refund of any kind whatsoever or be under any obligation or liability hereunder, except as expressly set forth herein."  Flagship argues that this portion of Section 4.5 is not a waiver of the right to rescind by the Tenant for a material breach of the Lease:

> This sentence of Section 4.5 plainly sets out
> the obligations of the Landlord to refund or
> pay Flagship 'hereunder' i.e., *under the
> Lease*, but has no facial applicability to any
> claims Flagship may have against the Landlord
> for its breach of its obligations under the
> Lease.

Flagship again notes that this portion of Section 4.5 does not

38

use the terms damages, judgments, causes of action, or other
similar language used in the indemnity section, Section 12.1.
Flagship refers to Section 15.1(a), which provides that, in the
event of a total Taking of the Premises, "this Lease shall
terminate as of the date of the Taking and the Basic Rent and
Additional Rent theretofore paid or then payable shall be
apportioned and paid up to the date of termination and any
unearned Basic Rent or Additional Rent shall be refunded to
Tenant."  Flagship argues that the "payment or refund" sentence
in Section 4.5 cannot be interpreted as waiving Flagship's right
to sue Excel for rescission of the Lease based on Excel's
material breach of the exclusive use provision.  Citing *Runyan v.
Pacific Air Industries, Inc.,* 2 Cal.3d 304, 310-319 (1970),
Flagship asserts that, in the face of rescission, the plaintiff
is awarded restitution damages, not a refund.

Excel responds that the whole of the Lease is consistent
with its position that Flagship's obligations are separate and
independent covenants and that Section 4.5 otherwise bars
rescission.  Excel contends that Flagship attempts to skirt the
legal effect of independent covenants and reads the language of
Section 4.5 "so technically and narrowly that the results are
ridiculous."  Excel refers to Section 14.3 of the Lease, in the
section captioned "Damage by Fire or Casualty:"

> Except as expressly provided in this Lease,
> Tenant's obligation to make payments of Basic
> Rent, Additional Rent and all other charges
> hereunder, except to the extent Landlord is
> actually reimbursed by the proceeds of rental

39

value insurance, and to perform all its covenants and conditions shall not be affected by any damage or destruction of the Premises or the improvements or replacements thereof.  Tenant hereby waives the provisions of any statute or law now or hereafter in effect which is contrary to the foregoing obligation of Tenant, or which relieves Tenant therefrom.

Excel asserts that, "[f]ollowing Plaintiffs' absurd logic, Plaintiffs could rescind the entire Ground Lease in the event of damage to its Improvements, because the word 'rescission' is not specifically stated."

However, for the reasons stated *supra*, Section 4.5 cannot be construed to preclude rescission because of Excel's material breach of the lease.  Section 4.5 by its terms provides that the tenant's obligation to pay rent under the lease is an independent covenant.  Section 4.5 does not refer in any way to the landlord's obligations to the tenant under the lease.  The jury specifically found that Excel's breach of the exclusive use provision in Section 6.3 of the lease was material.

5.  <u>Defendants' Conduct and Performance Shows They Never Interpreted Section 4.5 as Preventing the Remedy of Rescission</u>.

Flagship argues that Defendants' conduct with respect to Section 4.5 "is not reasonably interpreted as a waiver of rescission."

Flagship refers to the "principle of practical construction."  Flagship cites *Crestview Cemetary Ass'n v. Dieden*, 54 Cal.2d 744, 753-754 (1960):

40

That the actions of the parties should be used as a reliable means of interpreting an ambiguous contract is, of course, well settled in our law ... 'The acts of the parties under the contract afford one of the most reliable means of arriving at their intention; and, while not conclusive, the construction thus given to a contract by the parties before any controversy has arisen as to its meaning will, when reasonable, be adopted and enforced by the courts.' ... 'The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and a practical construction placed by the parties upon the instrument is the best evidence of their intention ....'

...

This rule of practical construction is predicated on the common sense concept that 'actions speak louder than words.' Words are frequently but an imperfect medium to convey thought and intention. When the parties to a contract perform under it and demonstrate by their conduct that they knew what they were talking about the courts should enforce that intent.

Appellants correctly claim that this doctrine of practical construction can only be applied when the contract is ambiguous, and cannot be used when the contract is unambiguous. That is undoubtedly a correct general statement of the law ... But the question involved in such cases is ambiguous to whom? Words frequently mean different things to different people. Here the contracting parties demonstrated by their actions that they knew what the words meant and were intended to mean. Thus, even if it be assumed that the words standing alone might mean one thing to the members of this court, where the parties have demonstrated by their actions and performance that to them the contract meant something quite different, the meaning and intent of the parties should be enforced. In such a situation the parties by their actions have

41

> created the 'ambiguity' required to bring the
> rule into operation.  If this were not the
> rule the courts would be enforcing one
> contract when both parties have demonstrated
> that they meant and intended the contract to
> be quite different.

Flagship argues that, under the principle of practical construction, the Court can consider Excel's conduct after Flagship's notice of rescission in April 2001, until the dispute regarding Section 4.5 arose, after the jury's verdict was returned in Flagship's favor.  Flagship argues that, underlying the rule of practical construction is the recognition that a party may modify its conduct with respect to the disputed issue following a disagreement.  Flagship asserts that, given Excel's position that Section 4.5 expressly bars rescission, it is logical to expect that Excel would have asserted this bar at the time the parties' dispute arose in 2000 and again in response to the notice of rescission.  Excel never contended that Section 4.5 constituted a waiver of Flagship's right to rescind at any time before this litigation commenced or at any time before this case was submitted to the jury: "Clearly, Defendants' assertion that Section 4.5 bars rescission was an afterthought."

Excel responds that Flagship fundamentally misunderstands the principle of practical construction, which focuses on how the parties behaved before any controversy erupted:

> If this doctrine has any application here, it
> supports Excel's position, not Plaintiffs.'
> This is so because Excel believed that the
> Four Seasons' use would not violate
> Plaintiffs' lease and Excel acted
> accordingly.  Obviously, from Excel's point

of view at the time, the remedy of rescission was irrelevant because there was no breach.

It is Excel that misinterprets the doctrine.  Excel did not assert that Flagship had no contractual right to rescind the lease and was limited to damages when Flagship gave notice of rescission.  Excel only made this contention after the jury had ruled that Excel had materially breached the exclusive use provision of the lease.  If Excel truly believed that rescission was not an available remedy, Excel would have so advised Flagship when Flagship gave notice of rescission and sought rescission as a remedy in its complaint.  If Excel had believed in the bar defense, its conduct is further inconsistent as it never brought, before or during trial, a dispositive motion on this issue.

6.   No California Case has Upheld Advance Waiver of Rescission for Material Breach.

In response to Excel's contention  that Section 4.5 is an "express" waiver of Flagship's right to rescind the Lease for Excel's material breach and citing *Medico-Dental Bldg. Co. of Los Angeles v. Horton & Converse*, *supra*, 21 Cal.2d at 434, Flagship asserts that a material breach occurs when the breach "will defeat the entire object of the lessee in entering into the lease."  Flagship contends that the California Supreme Court articulated the concept of a material breach:

> While consistent with practical considerations, it is said that a breach of a contractual right in a trivial or inappreciable respect will not justify rescission of the agreement by the party entitled to the benefit in question, a

> default in performance will not be tolerated
> if it is so dominant or pervasive as in any
> real or substantial measure to frustrate the
> purpose of the undertaking ... But where, as
> here, the covenant of the lessor is of such
> character that its breach will defeat the
> entire object of the lessee in entering into
> the lease, such as rendering his further
> occupancy of the premises a source of
> continuing financial loss incapable of
> satisfactory measurement in damages, it must
> be held that the covenant goes to the root of
> the consideration for the lease upon the
> lessee's part.

*Id.* at 433-434.  Flagship asserts that Excel's contention that

Flagship waived the right to rescind the agreement based on

Excel's breach of the exclusive use provision would "defeat the

entire object of the lessee in entering into the lease."

Flagship refers to Marvin Reiche's trial testimony that he would

not have entered into the Lease but for the exclusive use granted

to Flagship pursuant to the exclusive use provision.

*See discussion infra* re Flagship's argument that there is no

authority indicating that California Courts would interpret

Section 4.5 as an advance waiver of rescission for a material

breach of a lease, specifically, the *B.C. Richter Contracting Co.*

and *Michel & Pfeffer* decisions.

Flagship further argues that interpreting Section 4.5 as

preventing rescission for a material breach is contrary to public

policy reflected in California law.  Flagship cites *Philippine

Airlines, Inc. v. McDonnell Douglas Corp.*, 189 Cal.App.3d 234,

237-238 (1987):

> [C]ontractual clauses seeking to limit
> liability will be strictly construed and any

44

1                       ambiguities resolved against the party
seeking to limit its liability for

2                       negligence.

3                       'The language of an agreement in order to
exclude liability for negligence must be

4                       "clear and explicit" and "free of ambiguity
or obscurity." ... The law generally looks

5                       with disfavor on attempts to avoid liability
or to secure exemption from one's own

6                       negligence ... The law requires exculpatory
clauses to be strictly construed against the

7                       party relying on them ....

8  Flagship also cites *Queen Villas Homeowners Ass'n v. TCB Property*

9  *Management*, 149 Cal.App.4th 1, 5 (2007):

10                    Where a two-party contract purportedly
releases one side from liability to the other

11                    (e.g., *Saenz v. Whitewater Voyages, Inc.*
(1991) 226 Cal.App.3d 758 ... [contract in

12                    which plaintiff's decedent expressly assumed
the risk of white water rafting and relieved

13                    defendant rafting company of liability]),
courts must look for clear, unambiguous and

14                    explicit language not to hold the released
party liable.  As the *Saenz* court nicely put

15                    it: 'Everyone agrees that drafting a legally
valid release is no easy task.  Courts have

16                    criticized and struck down releases if the
language is oversimplified, if a key word is

17                    noted in the title but not the text, and if
the release is too lengthy or too general, to

18                    name a few deficiencies ... However, we must
remember that "[t]o be effective, a release

19                    need not achieve perfection ... It suffices
that a release be clear, unambiguous, and

20                    explicit, and that it express an agreement
not to hold the released party liable for

21                    negligence."'

22  Flagship asserts that the law of indemnity provisions is similar.

23  *See Prince v. Pacific Gas and Electric Co.*, 45 Cal.4th 1151, 1158

24  (2009):

25                    In the context of noninsurance indemnity
agreements, if a party seeks to be

26                    indemnified for its own active negligence, or

> regardless of the indemnitor's fault, the contractual language on the point 'must be particularly clear and explicit, and will be construed against the indemnitee.'

Flagship notes that California law bars the prior release of liability for gross negligence, *City of Santa Barbara v. Superior Court*, 41 Cal.4th 747, 758 (2007), or for negligent misrepresentations, *Blankenheim v. E.F. Hutton Co.,* 217 Cal.App.3d 1463, 1473 (1990).  Relying on this authority, Flagship contends:

> As the foregoing reveals, California has a strong public policy of requiring exculpatory clauses, to the extent they are valid, to clearly and unequivocally advise the exculpating party of exactly what conduct of Defendants is subject to exculpation.  As in the context of indemnity and releases, rescission can occur for a variety of circumstances.  In this regard, Civil Code § 1689 recognizes a range of circumstances under which a contract may be rescinded, from a consensual rescission to unilateral rescissions based on mistake, fraud or material failure of consideration ... The California Supreme Court has noted the range of circumstances upon which rescission could be based.  (*See Runyan*, 2 Cal.3d 317).  As such, there is a continuum of circumstances under which a contract may be rescinded from non-culpable and to culpable (i.e. a material breach) conduct.

Flagship argues that Section 4.5 "does not remotely meet the standard of a clear and unequivocal exculpatory provision" because "nothing in the language of Section 4.5 specifically mentions excusing the Defendants from a future material breach." Moreover, under this principle, given the prolixity of remedies court to be barred in Section 4.5, if Excel truly sought to bar

the right of rescission, if could have said so.

Flagship's public policy analysis is inapposite.  Section 4.5 is not a release or an indemnity provision.  Excel is arguing that Section 4.5 bars Flagship from the remedy of rescission even though Excel breached the Lease.  No case is cited by Flagship that suggests that California Courts strike down such a provision or interpretation on the ground that it violates a fundamental public policy of California.

    7. <u>Unconscionable</u>.

Flagship argues that interpreting Section 4.5 as a waiver of rescission would make Section 4.5 unconscionable as applied.

In the November 19, 2004 Memorandum Decision, the Court addressed Flagship's contention that Sections 4.5 and 22.25 are unconscionable as applied:

    E. <u>Unconscionability</u>.

> Plaintiffs claim that the Lease clauses are 'unconscionable in light of the context of this transaction' and cannot be applied ... Defendants cite *Markborough California, Inc. v. Superior Court* for the proposition that a limitation of liability provision is enforceable ... That case also says that 'although these provisions generally have been upheld as reasonable and valid, nonetheless, because they do in fact exculpate or insulate a party, at least to a certain extent, from liability for his or her own wrongful or negligent acts ... such provisions may be declared unenforceable if the provision is unconscionable or otherwise contrary to public policy.' *Markborough California, Inc. v. Superior Court*, 227 Cal.App.3d 705, 714-715 (Cal.Ct.App.1991). This is an affirmative defense that was not pled or preserved as an issue for trial in the Pretrial Order.

(Doc. 353, 44:1-45:15).   The Court then ruled that Flagship was not entitled to a jury trial on the issue of unconscionability, concluding that the case authority cited by Flagship did not establish a right to jury trial and:

> Most importantly, the issue was not reserved for trial and an afterthought defense to enforcement of the contract cannot be countenanced.  *See Canal Electric Co. v. Westinghouse Electric Co.,* 973 F.2d 988, 997-98 (1st Cir.1992) (raising unconscionability for the first time on appeal is untimely); *Oakwood Mobile Homes, Inc. v. Stevens*, 204 F.Supp.2d 947, 951 (D.W.Va.2002) (raising unconscionability for the first time on the day of mandatory arbitration hearing is too late; defense waived).  *Cf Beaver v. Figgie Intern. Corp.*, 849 F.2d 1472 (6th Cir.1988) (unpublished opinion) (on remand after grant of summary judgment reversed, issue of unconscionability now waived though it had never been previously raised).

(Doc. 353, 45:17-48:1).  With regard to Flagship's claim of unconscionability as a matter of law, the Court ruled:

> *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.,* 89 Cal.App.4th 1042, 1052-1053 (Cal.Ct.App.2001) (citing *A&M Produce Co. v. FMC Corp.*, 135 Cal.App.3d 473, 486-87 (Cal.Ct.App.1982) discusses unconsionability:
>
>> Unconscionability has both a procedural and a substantive element.  The procedural element focuses [on] 'oppression' and 'surprise.' '"Oppression" arises from an inequality of bargaining power which results in no real negotiation and "an absence of meaningful choice."  "Surprise" involves the extent to which the supposedly agreed-upon terms are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms.'  The

48

substantive element has to do with the effects of the contractual terms and whether they are unreasonable.  Because a contract is largely an allocation of risks, a contractual provision is 'substantively suspect if it reallocates the risks in an objectively unreasonable or unexpected manner.'

To be unenforceable, a contract must be both procedurally and substantively unconscionable, although the greater the procedural unconscionability, the less unreasonable the risk allocation that will be tolerated.

Plaintiffs assert that Marvin Reiche (who negotiated the lease on behalf of Plaintiffs) had little bargaining power ... As evidence Plaintiffs point out that the Lease is based on a pre-existing Excel lease negotiated with another restaurant ... Even assuming this fact to be true, Plaintiffs have not demonstrated 'oppression,' which requires circumstances where the oppressed party was not in a position to negotiate and given no meaningful choice.  Defendants assert that Plaintiffs had a choice since they were considering multiple sites for their proposed restaurant ... Plaintiffs were experienced and sophisticated restaurant operators.  The Lease was negotiated and Plaintiffs insisted on the exclusive use clause.  There is no evidence that the Briggsmore Plaza was the only site under consideration or that the Lease was offered on a take it or leave it basis.  Defendants also point out that the Lease was actively negotiated over a period of months and Plaintiffs 'submitted extensive comments on the draft.' ....

Plaintiffs rely on *A&M Produce Co. v. FMC Corp.* to show that even contracts negotiated by experienced parties can be unconscionable where there is great imbalance of bargaining power ... The factual scenario of *A&M Produce* is significantly different from the one at hand since the plaintiff was not permitted to

1
      negotiate the terms of the contract.  *A&M Produce Co. v. FMC Corp.*, 135 Cal.App.3d 473,
2
491 (Cal.Ct.App.1982).  Plaintiffs did not adduce evidence that they were unable to
3
negotiate the terms of the Lease.  Plaintiffs did not show any other sites were unavailable
4
or that they were without choice.

5
(Doc. 353, 48:3-49:21).  As to the element of surprise as to

6
Section 4.5, the Court ruled:

7
      With respect to § 4.5, the Lease shows that the parties modified the provision, striking
8
out the term 'or the Access Area' several times.  These changes were ratified by
9
initials 'MGR' (Marvin G. Reiche) in the margins ... Plaintiffs cannot claim that §
10
4.5 escaped their notice.

11
(Doc. 353, 51:10-15).

12
    Flagship contends that the Court's discussion of

13
unconscionability in the November 19, 2004 Memorandum Decision

14
was made only after finding that Flagship had not reserved the

15
issue for trial with respect to the factual issues surrounding

16
unconscionability of Section 4.5 and, therefore, the Court's

17
"prior observations were dicta."  Flagship refers to the Ninth

18
Circuit's remand that the Court consider whether the Lease "in

19
its entirety, allows for rescission and whether California law

20
would give effect to the lease's limitations on remedies in these

21
circumstances."  Flagship asserts that the Ninth Circuit's

22
mandate re-opens the issue of unconscionability in interpreting

23
Section 4.5, citing *United States v. Kellington*, 217 F.3d 1084,

24
1093 (9th Cir.2000)("According to the rule of mandate, although

25
lower courts are obliged to execute the terms of a mandate, they

26
are free as to 'anything not foreclosed by the mandate.').

Flagship further contends that the Ninth Circuit's mandate "suggests that this Court construed the pretrial order too narrowly in finding that Plaintiffs did not 'preserve' the issue of unconscionability for trial."  Flagship asserts:

> Specifically, the pretrial order asserted that Plaintiffs were seeking rescission and also that Plaintiffs sought declaratory relief with respect to the parties' rights and obligations under the Lease.  (Doc. No. 214, Pretrial Order at 14:10-15:21.)  This statement of the relief sought, including a declaration of the rights of the parties, would seem sufficient to preserve the issue of unconscionability, with respect to Defendants' post-trial proffer of an interpretation of Section 4.5.  If, as the court of appeal found, the statement of issues, facts and contentions in the pretrial order were sufficient to preserve Defendants' right to argue an interpretation of the Lease that they never presented before the jury's verdict was announced, it is also sufficient to preserve Plaintiffs' right to rebut such an argument, including the argument that Section 4.5 is unconscionable if interpreted as a waiver of rescission.

Although the Ninth Circuit's ruling in this case addressed the Court's invocation of judicial estoppel to bar Excel from contending that Section 4.5, Flagship's point that the Ninth Circuit's mandate allows consideration of the issue of unconscionability is well-taken because the Court is mandated to determine "whether the contract, in its entirety, allows for rescission and whether California law would give effect to the lease's limitations on remedies in these circumstances."

California Civil Code § 1670.5(a) provides:

> If the court as a matter of law finds the contract or any clause of the contract to

1          **have been unconscionable at the time it was**
          **made the court may refuse to enforce the**
2          **contract, or it may enforce the remainder of**
          **the contract without the unconscionable**
3          **clause, or it may so limit the application of**
          **any unconscionable clause as to avoid any**
4          **unconscionable result.**

5    **Flagship argues that interpreting Section 4.5 as a waiver of**

6  **rescission would render Section 4.5 unconscionable both**

7  **substantively and procedurally, with the element of substantive**

8  **unconscionability predominating over the element of procedural**

9  **unconscionability.**

10    **As explained in** *Gentry v. Superior Court*, **42 Cal.4th 443**

11  **(2007), addressing the Court of Appeal's conclusion that a 30-day**

12  **opt-out provision in an arbitration agreement was procedurally**

13  **unconscionable:**

14          **"'" To briefly recapitulate the principles of**
          **unconscionability, the doctrine has '"both a**
15          **'procedural' and a 'substantive' element,"**
          **the former focusing on "'oppression'" or**
16          **"'surprise'" due to unequal bargaining power,**
          **the latter on "'overly harsh'" or "'one-**
17          **sided'" results.' ... The procedural element**
          **of an unconscionable contract generally takes**
18          **the form of a contract of adhesion, '"which,**
          **imposed and drafted by the party of superior**
19          **bargaining strength, relegates to the**
          **subscribing party only the opportunity to**
20          **adhere to the contract or reject it."' ...**
          **Substantively unconscionable terms may take**
21          **various forms, but may generally be described**
          **as unfairly one-sided."'**

22

23          **As we have further explained: '"The**
          **prevailing view is that [procedural and**
          **substantive unconscionability] must both be**
24          **present in order for a court to exercise its**
          **discretion to refuse to enforce a contract or**
25          **clause under the doctrine of**
          **unconscionability." ... But they need not be**
26          **present in the same degree. "Essentially a**

sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves." ... In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.' ....

As the above suggests, a finding of procedural unconscionability does not mean that a contract will not be enforced, but rather that courts will scrutinize the substantive terms of the contract to ensure they are not manifestly unfair or one-sided ... [T]here are degrees of procedural unconscionability. Although certain terms in these contracts may be construed strictly, courts will not find these contracts substantively unconscionable, no matter how one-sided the terms appear to be. (See, e.g., *Nunes Turfgrass, Inc. v. Vaughn-Jacklin Seed Co.* (1988) 200 Cal.App.3d 1518, 1538-1539 ... [liability limitation negotiated by two commercial entities upheld].) Contracts of adhesion that involve surprise or other sharp practices lie on the other side of the spectrum. (See, e.g., *Ellis v. McKinnon Broadcasting Co.* (1993) 18 Cal.App.4th 1796, 1804 ... [party told that signing contract was 'mere formality' to conceal oppressive forfeiture provision].) Ordinary contracts of adhesion, although they are indispensable facts of modern life that are generally enforced ... contain a degree of procedural unconscionability even without any notable surprises, and 'bear within them the clear danger of oppression and overreaching.' ....

Thus, a conclusion that a contract contains no element of procedural unconscionability is tantamount to saying that, no matter how one-sided the contract terms, a court will not disturb the contract because of its confidence that the contract was negotiated freely, that the party subject to a seemingly one-sided term is presumed to have obtained some advantage from conceding the term or

53

> that, if one party negotiated poorly, it is
> not the court's place to rectify these kinds
> of errors or asymmetries.

42 Cal.4th at 468-470.

Flagship again relies primarily on *A&M Produce Co. v. FMC Corp.,* 135 Cal.App.3d 473 (1982).  A&M brought suit against FMC from which it had bought a weight sizing machine for use in processing plaintiff's tomato crop, alleging breach of express and implied warranties.  The trial court ruled that clauses in FMC's preprinted contract disclaiming all warranties and excluding consequential damages were unconscionable.  The Court of Appeal affirmed.  Flagship relies on the following statement from *A&M Produce Corp.*:

> Another factor supporting the trial court's
> determination involves the avoidability of
> damages and relates directly to the
> allocation of risks which lie at the
> foundation of the contractual bargain.  It
> has been suggested that '[r]isk shifting is
> socially expensive and should not be
> undertaken in the absence of a good reason.
> An even better reason is required when to so
> shift is contrary to a contract freely
> negotiated.' ... But as we noted previously,
> FMC was the only party reasonably able to
> prevent this loss by not selling A & M a
> machine inadequate to meet its expressed
> needs ... 'If there is a type of risk
> allocation that should be subjected to
> special scrutiny, it is probably the shifting
> to one party of a risk that *only* the other
> party can avoid.' ....

135 Cal.App.3d at 493.

Flagship argues that, according to Excel, Section 4.5 is not a reciprocal provision; it applies only to the tenant's obligations and does not bar any remedy by the landlord.

1   Flagship refers to Section 18.2(c) of the Lease:

2           18.   **EVENTS OF DEFAULT: REMEDIES**

3           ...

4               18.2 **Remedies**.

5           ...

6               (c) If an Event of Default shall
        occur, then, in addition to any other rights
7       or remedies available to Landlord at law or
        in equity, Landlord shall have the right to
8       perform some or all of Tenant's Obligations
        which are then in default, without further
9       notice to Tenant.  In such event, any and all
        costs incurred by Landlord therefor
10      (including, without limitation, reasonable
        attorney's fees and expenses) shall be
11      payable by Tenant to Landlord upon demand.

12  Flagship argues that Excel's interpretation of the Lease is that

13  Flagship waived its right to rescind in the event of Excel's

14  material breach, but Excel maintained the right to all equitable

15  remedies, including rescission, in the event of Flagship's

16  breach.  Citing *Money Store Investment Corp. v. Southern*

17  *California Bank,* 98 Cal.App.4th 722, 728 (2002), Flagship argues

18  that "such an imbalance in the parties' rights to rescind the

19  agreement renders the Lease subject to attack for the lack of

20  mutuality of obligation."

21      Flagship's reliance on the *Money Store Investment Corp.* to

22  establish that Section 4.5 as construed by Excel is

23  unconscionable, is misplaced.  In *Money Store Investment Corp.*,

24  the Court of Appeal stated:

25              The Bank asserts that the agreement was
        illusory because the Money Store's
26      instructions 'reserved the right to withdraw

                            55

> or amend these instructions at any time prior
> to the close of escrow.'  The Bank is correct
> on its general point of law: 'Where a
> contract imposes no definite obligation on
> one party to perform, it lacks mutuality of
> obligation.  It is elementary that where
> performance is optional with one of the
> parties no enforceable obligation exists....'
> ...
>
> A corollary to that rule exists, however.  An
> agreement that is otherwise illusory may be
> enforced where the promisor has rendered at
> least partial performance ... The Money Store
> performed.  It provided the loan money
> necessary to complete the sale.  Performance
> cured any illusory aspect of the agreement.

Here, Flagship does not argue that the Lease was illusory;

rather, Flagship argues that Section 4.5, as construed by Excel,

should not be enforced because of unconsionability.

     Flagship asserts that Excel's interpretation of Section 4.5

allocates the risk of Excel's failure to honor their promise of

an exclusive buffet restaurant in the shopping center to

Flagship.  Flagship argues:

> [Excel's] interpretation of Section 4.5 ...
> means that Flagship agreed to remain in a
> contract with Defendants regardless of
> Defendants' material breach; and that
> Flagship and the Reiches agreed to spend $2
> million constructing a building on
> Defendants' property, with no ability to
> recoup the loss from Defendants in the event
> of Defendants' material breach of the Lease.
> In this regard, Defendants offered no
> evidence at trial that the parties intended
> Section 4.5 to operate in that fashion, or
> that the Reiches understood that Section 4.5
> meant that the Defendants could breach the
> exclusive [sic] immediately, and Flagship
> would be stuck with the Lease.  This result,
> like the preclusion of consequential damages
> in *A&M Produce* is substantively
> unconscionable and shocking to the

56

1   conscience.

2       Flagship fails to demonstrate procedural unconscionability.

3   As concluded in the November 19, 2004 Memorandum Decision, the

4   Lease was negotiated on both sides by sophisticated, experienced

5   parties.  That Flagship did not know or understand that Excel

6   would attempt to construe Section 4.5 to preclude rescission of

7   the lease by Flagship because of Excel's breach of Section 6.3's

8   exclusive use provision does not establish procedural

9   unconscionability.

10          8.   <u>Jury's Finding of Material Breach Defeats</u>

11   <u>Independent Covenant</u>.

12       Flagship argues that the jury's finding of material breach

13   defeats any contention that the exclusive use provision was an

14   independent covenant, referring to the statement in Section 4.5

15   that "[t]he obligations of Tenant in this Lease shall be separate

16   and independent covenants and agreements."  Flagship contends

17   that, if Excel believed that Section 4.5 made Excel's obligation

18   to honor the exclusive use provision an independent covenant,

19   thereby making the breach of the exclusive use provision not

20   material, Excel should have presented this contention to the

21   jury.  Flagship asserts: "Because Defendants did not do so, and

22   the jury decided the question of materiality, they cannot now ask

23   the court to decide this question."

24       Flagship cites *Gaia Technologies, Inc. v. Recycled Products,*

25   *Corp.,* 175 F.3d 365 (5th Cir.1999).  In *Gaia*, the alleged owner

26   of patents and trademarks brought an action against corporate and

individual defendants for infringement under federal law, and for unfair competition, tortious interference with prospective contractual relations, and misappropriation of trade secrets under state law.  After the alleged owner obtained judgment against defendants, the Federal Circuit reversed as to the infringement claims and remanded, allowing the District Court to decide whether to exercise supplemental jurisdiction over the state law claims.  On remand, the District Court entered judgment for the alleged owner on the state law claims and the individual defendants appealed to the Fifth Circuit.  The Fifth Circuit held that the District Court erred in relying on Rule 49(a), Federal Rules of Civil Procedure, to make findings contrary to the jury's verdict:

> Nothing in the text of Rule 49(a) authorizes a district court to reform a jury's decision on issues submitted to the jury.  Rule 49(a) allows the district court to make its own findings only as to issues not submitted to the jury ... Furthermore, Rule 49(a) does not permit a district court to make findings contrary to the jury verdict.  *See Askanase*, 130 F.3d at 670 ('Appellant correctly states that a Rule 49(a) finding cannot be inconsistent with the jury verdict.'); *see also Floyd v. Laws*, 929 F.2d 1390, 1397 (9th Cir.1991)(holding that 'under Rule 49(a), the trial court simply cannot choose to ignore a legitimate finding that is part of the special verdict').  Here, the district court submitted the elements of Gaia's state law claims to the jury, and the jury found that Gaia failed to prove any of the elements as to the individual defendants.  Thus Rule 49(a) does not authorize the district court to reform the jury's state law findings in order to hold the individual defendant's liable for Gaia's state law causes of action.

*Id.* at 370-371.

Flagship notes that, although Flagship argued that the verdict was a special verdict, the Court ruled that the verdict was a general verdict.  (Doc. 353, November 19, 2004 Memorandum Decision, 29:6-7).  Flagship contends that the "rule articulated in *Gaia*" is not tied to any particular form of verdict:

> Preliminarily, the individual defendants contend that we should treat the jury verdict as a general verdict accompanied by interrogatories, governed by Rule 49(b), as opposed to a special verdict, governed by Rule 49(a) ... According to the defendants, Rule 49(b) affords greater deference to a jury's finding than Rule 49(a).  We need not address this contention, however, because we conclude that not even Rule 49(a) authorizes the district court's modification of the jury verdict.  Gaia does not contend that Rule 49(b) provides an alternative ground for upholding the district court's reformation.

*Gaia*, *supra*, 175 F.3d at 370 n.5.  Because, Flagship argues, the type of verdict does not affect the "validity of this rule," and "because the jury decided that the exclusive use provision, and Defendants' breach thereof was material, Defendants cannot now ask the court to make a ruling contrary to the jury's verdict."

Excel responds that the jury's verdict is irrelevant to interpretation of the Ground Lease, an issue of law for the Court.  However, as ruled *supra*, Excel's construction of Section 4.5 is without merit.

Excel further asserts that, in an action at law for breach of contract, a material breach generally entitles the non-breaching party to cancel a contract prospectively and recover

damages, but does not, as a matter of course justify rescission.
Excel contends that Flagship cites no authority allowing
rescission for breach of an independent covenant:

> They simply assert that the jury's finding of
> a 'material breach' in the breach of contract
> action trumps the Ground Lease and converts
> its independent covenants into conditions
> precedent.  This is unsustainable as a matter
> of the law of independent covenants and,
> therefore, the finding of material breach is
> irrelevant to the issues now before the
> Court.

Excel argues that, if the jury had found the exclusive use
provision to be a dependent covenant, such a verdict would have
been vacated by the Court under Rule 50, Federal Rules of Civil
Procedure, as not supported by the evidence.  For the reasons
stated *supra*, Excel's contention is baseless, if not vexatious.
A jury does not make a legal finding whether a covenant is
dependent.

Excel cites *Barerra v. State Farm Mut. Auto. Ins. Co.*, 71
Cal.2d 659 (1969).  In *Barrera*, the plaintiff sued State Farm to
compel payment of a judgment against State Farm's insureds, the
Alves, for their negligent driving that injured the plaintiff.
Plaintiff alleged the enforceability at the time of the accident
of State Farm's liability policy.  State Farm denied the validity
of the policy, and cross-claimed seeking a declaration that the
policy was void *ab initio* because it was issued in reliance on a
material misrepresentation by the Alves.  Plaintiff contended
that State Farm was estopped to rescind the policy six months
after the accident because State Farm led the Alves to believe

that he was insured and because State Farm negligently failed to discover within a reasonable time the misrepresentation in the application tendered more than a year prior to the accident. The trial court found that State Farm issued the policy in reliance on a material misrepresentation, that rescission was therefore justified, and that State Farm acted promptly upon discovery of the misrepresentation, and found for State Farm. Plaintiff moved for a new trial on the ground that the public policy expressed in California's Financial Responsibility Law impelled a finding of laches by State Farm in its belated discovery of the misrepresentation and that its failure to act promptly worked to the detriment of an innocent member of the public, who should therefore recover against State Farm. The trial court denied the motion for new trial. On appeal, the Supreme Court reversed for a new trial, ruling that an automobile liability insurer must undertake a reasonable investigation of the insured's insurability within a reasonable period of time from the acceptance of the application and issuance of the policy; that this duty inures directly to the benefit of third persons injured by the insured; that the injured party, who has obtained an unsatisfied judgment against the insured, may proceed against the insurer; and that the insurer cannot then successfully defend upon the ground of its own failure reasonably to investigate the application. 71 Cal.2d at 663. The Supreme Court noted:

> In addition to arguing that State Farm was estopped to rescind the policy because of negligent failure to discover the

misrepresentation within a reasonable time, plaintiff also argued that section 651 of the Insurance Code applied to rescission as well as to prospective cancellation of automobile insurance policies, and that therefore the attempted rescission did not take effect until 10 days after notice of rescission was sent to Mr. Alves.  If termination of the policy did not occur until after notice, the policy remained in effect at the time of the accident.

Plaintiff's contention regarding section 651 runs counter to the statutory scheme for termination of insurance contracts and blurs the clear statutory distinction between 'rescission' (retroactive termination) and 'cancellation' (prospective termination) of insurance policies.  Section 651 provides: 'Notwithstanding any other provision of this code, no cancellation by an insurer of an auto liability insurance policy shall be effective prior to the mailing or delivery to the named insured at the address shown in the policy, of a written notice of cancellation stating when, not less than ten (10) days after the date of such mailing or delivery, the date the cancellation shall become effective.'

The Legislature added section 651 in 1957 ... In 1957, the Insurance Code did not contain a separate chapter on 'Cancellation' ....

The statutory scheme reflects a deliberate distinction between 'rescission' and 'cancellation.'  Sections 331, 338, and 359, which prescribe the grounds for rescission, all involve false statements or material omissions in the procurement of the policy. Section 660 ..., on the other hand, provided: 'The commissioner, by regulation, shall prescribe the grounds upon which an insurer may cancel a policy of automobile insurance. No insurer shall cancel a policy of automobile insurance except upon such ground or grounds as have been prescribed by the commissioner.' ....

Unless we say that automobile liability insurance policies cannot be rescinded at all

62

and that section 660 completely abrogated the
rescission section for automobile liability
insurance, we must hold that section 651,
which specifically refers to 'cancellation,'
does not control the procedure for
'rescission' of automobile liability
insurance.  Instead, the general section
governing rescission of insurance policies,
section 650, applies.  Section 650 provides:
'Whenever a right to rescind a contract of
insurance is given to the insurer by any
provision of this part such right may be
exercised at any time previous to the
commencement of an action on the contract.'
The issue, then, turns on the validity of
plaintiff's contention that the public policy
of this state requires that an automobile
liability insurer reasonably investigate
within a reasonable time after issuance of
the policy or otherwise be estopped to
rescind the policy, at least in an action by
an injured person who has obtained a judgment
from the insured.

71 Cal.2d at 663 n.3.

Excel also cites *Mamula v. McCulloch*, 275 Cal.App.2d 184,

196-197 (1969):

Plaintiff urges that the court erred in
failing to make findings upon the issue as to
whether or not she was entitled to recover on
the theory of unjust enrichment.

The trial court found that the oral agreement
of July 1, 1963, was for the abandonment and
cancellation of the oral purchase and sale
agreement involving the hospital property and
that it was supported by a valuable
consideration.  As heretofore pointed out,
such oral agreement made a complete
disposition of the rights of the respective
parties under the oral purchase and sale
agreement.  Such rights having been
completely settled by the oral contract of
abandonment, there was no basis for the
application of the rule of unjust enrichment.

'To "cancel" a contract means to abrogate so
much of it as remains unperformed.  It

63

>differs from "rescission," which means to
>restore the parties to their former position.
>The one refers to the state of things at the
>time of cancellation; the other to the state
>of things existing when the contract was
>made.' ... Here, the oral agreement of
>cancellation did away with the oral agreement
>of purchase and sale upon the terms and
>conditions and with the consequences
>mentioned in the agreement of cancellation
>... In this state of the record, a specific
>finding on whether plaintiff was or was not
>entitled to recover on the theory of unjust
>enrichment would be redundant.

Excel cites *Fireman's Fund American Ins. Co. v. Escobedo*, 80 Cal.App.3d 610 (1978), which involved an action by the insurance company of one motorist against the insurance company of the second motorist and the motorists.  The trial court determined that defendant insurer's rescission of its insureds' assigned risk automobile policy was effective as against its insureds, but ineffective as against the owners and drivers of the other vehicle and plaintiff, their insurer.  On appeal, the Court of Appeals addressed the argument that once a risk has been assigned under the California Automobile Assigned Risk Plan (CAARP) and the designated insurer has ratified the coverage, 10 California Administrative Code § 2470, specifies the only method open to an insurer to relieve itself of an assigned risk which was accepted:

>Section 331 of the Insurance Code provides:
>'Concealment, whether intentional or
>unintentional, entitles the injured party to
>rescind insurance.'  Concealment is defined
>as 'Neglect to communicate that which a party
>knows, and ought to communicate ....' ... In
>addition to concealment as a ground for
>rescission, section 359 of the Insurance Code
>provides that a contract of insurance may be
>rescinded on the ground of material

misrepresentation: 'If a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time the representation becomes false.' ....

The California Assigned Risk Plan was enacted to provide liability insurance coverage for applicants who are *in good faith* entitled to but unable to procure such insurance through ordinary methods ... Nothing in the authorizing legislation suggests that the laws applying to insurance policies in general are not applicable to the assigned risk plan.  The regulations promulgated by CAARP deal only with cancellation and not rescission.  Cancellation and rescission are not synonymous.  One is prospective, while the other is retroactive ... Appellant Employer's Casualty is correct in its contention that the statutory remedy of rescission is applicable to assigned risk policies.

80 Cal.App.3d at 619.

Excel also cites *Welles v. Turner Entertainment Co.*, *supra,* 503 F.3d 728.[4]  In *Welles,* the plaintiff argued that the Exit Agreement, which "cancelled and terminated" the Production Agreement, returned the *Citizen Kane* copyright to Mercury.  The Ninth Circuit ruled:

[T]he Exit Agreement stated that it was 'the mutual desire of the parties to terminate and cancel' their prior agreements.  Beatrice Welles argues that this language rescinded the parties' prior agreements and thus returned any right Orson Welles and Mercury had in the *Citizen Kane* motion picture to them.  However, under California law, it seems that 'terminate' and 'cancel' mean something different from 'rescind':

---

[4]Excel cited *Welles* as *Welles v. Turner Entertainment Co.,* 488 F.3d 1178 (9th Cir.2007).  However, the opinion was amended and superseded on denial of rehearing.

> The words 'terminate,' 'revoke' and
> cancel,' ... all have the same
> meaning, namely, the abrogation of
> so much of the contract as might
> remain executory at the time notice
> is given, and must be sharply
> distinguished from the word
> 'rescind,' ... which conveys a
> retroactive effect, meaning to
> restore the parties to their former
> position.
>
> *Grant v. Aerodraulics Co.,* 91 Cal.App.2d 68
> ... (1949).  Thus, under California law, the
> Exit Agreement prospectively terminated and
> cancelled Orson Welle's right to royalties,
> but did not retroactively rescind RKO's
> copyright in the *Citizen Kane* motion picture
> unless RKO's copyright remained executory at
> the time of the Exit Agreement.

503 F.3d at 738.

Excel asserts that the jury was not instructed on rescission or failure of consideration, but was instructed only on prospective cancellation in connection with Flagship's breach of contract claim.  This, of course, was a result of the parties' express agreement that the issue of rescission was to be determined after the jury's verdict.  Excel refers to the Court's statement to the jury on December 2, 2003 (Exh. E to Excel's response to Flagship's motion regarding interpretation of Section 4.5):

> defendant was - and I'm using the word Excel
> Realty Partners, that's one of the defendants
> - was canceled.
>
> A party to a contract may cancel the contract
> if, for any reason, the party does not
> receive the material performance that was
> promised by the other party or if an
> important part of the performance that was
> promised was not provided.

> The term 'material,' as used in the
> instructions, means important or serious.
> You must decide whether plaintiff failed to
> receive any material performance defendant
> promised to provide.  Performance is material
> if it is important to a contract and if it is
> likely to cause a reasonable person not to
> have entered into the contract if such
> performance was not provided.

Thus, Excel contends, the jury was never instructed on rescission

and never asked to determine whether there was a failure of

consideration (or whether the breach was so material that it

would constitute a failure of consideration).  Based on *Welles*,

Excel contends:

> [T]he jury verdict of material breach in no
> way constituted a finding of a failure of
> consideration or of a right to rescission.
> And, the jury's verdict cannot overrule a
> fundamental principle of contract, that
> breach of an independent covenant does not
> justify rescission.

Flagship replies that the cases upon which Excel relies in

distinguishing between "cancel" and "rescind" concern

interpretation of insurance policy language under very specific

provisions of the California Insurance Code or the construction

of a second agreement that purported to "cancel" a prior

agreement.  This is true.  The insurance contract cases are

inapplicable.  Flagship cites *Pico Citizens Bank v. Tafco, Inc.*,

201 Cal.App.2d 131 (1962).

In *Pico Citizens Bank*, Moos and Tafco entered into a written

contract by which Moos agreed to manufacture and Tafco agreed to

sell knife and scissor sharpeners.  In a letter signed by Tafco's

president, various oral agreements theretofore reached were

confirmed; among other things, the agreement provided that title

to the sharpeners would remain in Moos until they were sold by

Tafco to third parties.   Another clause of the contract provided:

"In the event it [the contract] is cancelled by either party, the

above arrangement will remain in effect until you [seller] have

been paid for the merchandise delivered and the dies and other

equipment of ours returned to us.   Neither party shall terminate

any part of this agreement without giving the party ninety (90)

days written notice in advance."   The appellate court held:

> Taking up the first of Tafco's major points
> on appeal, it is contended that neither the
> letter of May 10, 1955, nor the notice of
> rescission received by Tafco on June 24,
> 1955, served to cancel the contract within
> the meaning of the subject agreement.
> Emphasized by Tafco is the claim that the
> word 'cancel' is not found in either
> document.   Thus, the May 10 letter simply
> demanded an accounting and payment in full of
> the outstanding balance, while the June
> notice and demand made use of the word
> 'rescission' in its heading.   There is a
> distinction, of course, between the terms
> 'cancel' and 'rescind' – accordingly, it has
> been observed that 'an important problem of
> construction is presented by notices or
> agreements which purport to terminate the
> contract.'   (Witkin, Summary of Cal. Law (7th
> ed. 1960) 324).   Cited in the work just
> quoted is *Winter v. Kitto*, 100 Cal.App. 302
> ..., wherein expressions of 'cancellation' or
> 'rescission' were not construed as the
> renunciation of any claim for damages for
> prior breach unless such intention clearly
> appears.   The factual question is a close
> one; but two trials have resulted in findings
> that either or both of the documents just
> mentioned effected a cancellation pursuant to
> the terms of the agreement.   'The question of
> whether a contract has been cancelled,
> rescinded or abandoned is a mixed question of
> law and fact ... which is addressed to the

> trial court ... and the finding of the trial
> court will be upheld if it is supported by
> substantial evidence.' ....

Relying on this statement from *Pico Citizens Bank* and their

asserted distinction of the cases relied upon by Excel, Flagship

asserts:

> As such, the difference between cancellation
> and rescission is material to construing a
> second agreement or writing and whether it
> purports to cancel the remainder of a
> contract that is executory, or whether it
> seeks to rescind the contract ... Here, Excel
> does not raise any issue that Flagship's
> notice of rescission, which was presented to
> the jury, sought anything other than
> rescission.  Overall, Defendants do not
> explain how these cases advance their
> proffered interpretation of the Lease.

What can be said about the jury's verdict is that it

determined there was a breach of contract and that the breach was

material, giving rise to Flagship's election of remedies.

> 9.   Equitable Estoppel.

Although conceding that judicial estoppel may not apply to

the facts, Flagship asserts that the Court did not decide whether

equitable estoppel applied.  Flagship refers to the September 30

Memorandum Decision, (Doc. 362, 18:23-19:):

> Defendant also argues that the court erred in
> holding that equitable estoppel barred
> Defendant from asserting § 4.5 as a defense.
> While it is true that the court cited
> elements of equitable estoppel in the
> estoppel section of its decision, it is not
> the case that the court actually held that
> equitable estoppel applied.  A careful
> reading of the estoppel discussion reveals
> that the court's reasoning followed the law
> of judicial estoppel.  At the end of the
> section, the court stated that '[b]y staying

> silent on § 4.5 until the 9th day of trial
> and leading the court and Plaintiffs to
> believe that rescission was being actively
> litigated, Defendants are estopped from
> raising § 4.5 as a bar to a rescission
> remedy.'  (Doc. 353, November 2004 Order 53)
> The court's discussion of the equitable
> estoppel standard and the absence of specific
> reference to judicial estoppel, even if
> ambiguous, does not prevent the application
> of judicial estoppel.  This holding requiring
> Defendant to be bound by its conduct
> throughout the litigation is not clearly
> erroneous.  Defendant was properly estopped
> from asserting § 4.5 as a bar to rescission.

Four elements must ordinarily be proved to establish an

equitable estoppel: (1) the party to be estopped must know the

facts; (2) he must intend that his conduct shall be acted upon,

or must so act that the party asserting the estoppel had the

right to believe that it was so intended; (3) the party asserting

the estoppel must be ignorant of the true state of facts; and (4)

he must rely upon the conduct to his injury.  *Salgado-Diaz v.*

*Ashcroft,* 395 F.3d 1158, 1166 (9th Cir.2005); *Hampton v.*

*Paramount Pictures Corp.,* 270 F.3d 100, 104 (9th Cir.1960).

Flagship argues that these elements are satisfied:

> Defendants allowed this case to proceed from
> the complaint through discovery, through
> trial without ever suggesting that
> Plaintiffs' were barred from their clearly
> pled claim for rescission.  Defendants acted
> such that Plaintiffs had the right to believe
> the Lease did not prevent rescission, and
> that Defendants would assert this position.
> Plaintiffs had no idea Defendants would claim
> a provision listed in the Lease paragraph
> concerning rent and not expressly mentioning
> the word rescission barred the remedy of
> rescission.  Plaintiffs reliance on
> Defendants' position is only strengthened by
> Defendants complete failure to raise the

issue in their answers, discovery responses,
summary judgment proceedings, in motions *in
limine*, pretrial statements, or pretrial
conferences.  As this Court has recognized,
Plaintiffs relied on Defendants' failure to
assert Section 4.5 as a bar to rescission,
and therefore were prejudiced by not having
the opportunity to conduct discovery as to
the 'commercial setting, purpose, and effect'
of Section 4.5.  (Doc. No. 362 at 18:10-22).

In the September 30 Memorandum Decision, the Court, in its

discussion of application of judicial estoppel, ruled:

Third, Defendant would obtain an unfair
advantage if it is allowed to assert § 4.5 as
a bar to rescission at such a late stage in
the litigation.  Discovery was not conducted
as to § 4.5.  Plaintiffs did not know the
section would be invoked as a defense by any
dispositive motion or the Pretrial Order.
The contract damages awarded by the jury that
Defendant would have to pay amount to
approximately $1.5 million; the damages that
Defendant could potentially pay if rescission
is granted are substantially more, up to the
[sic] approximately $3.9 million.  Finally,
estoppel in this situation serves the overall
policy goal of judicial estoppel to 'protect
against a litigant playing fast and loose
with the courts.' ....

(Doc. No. 362 at 18:10-22).

Excel responds that Flagship's argument concerning

application of equitable estoppel is "utterly spurious."  Excel

refers to the November 19, 2004 Memorandum Decision, (Doc. 353),

where the Court discussed whether Excel waived application of

Section 4.5 as a contractual limitation on the recovery available

to Flagship.  (Doc. 353, 37:12-54:5).  Specifically, Excel

refers to the following conclusion in the November 19, 2004

Memorandum Decision:

> With respect to contractual limitations on
> damages in a contract dispute, the defense is
> contained in the cause of action itself.
> Both sides had full access to the Lease (38
> pages long) and are presumed to have examined
> it carefully.  There is no danger of unfair
> surprise by assertion of this defense.

(Doc. 353, 41:22-26).  Excel contends that Flagship was not

ignorant of the true facts:

> Excel is unaware of any basis or any judicial
> precedent applying equitable estoppel to a
> party's assertion of its rights under a
> written contract, the provisions of which
> were specifically negotiated and executed by
> the parties and Plaintiffs have cited no such
> authority.  This is not a case of a hidden
> unknown fact being secreted by one party to
> disadvantage another.

Flagship replies that Excel mischaracterizes Flagship's

asserted basis for equitable estoppel:

> Defendants never asserted their
> interpretation that Section 4.5 bars
> rescission until over two years after
> Plaintiff's notice of rescission, and until
> after a 9-day trial litigating the very
> remedy they claim Section 4.5 bars.  (See
> Pltfs' P&A at 19-23.)  If Defendants believed
> Section 4.5 meant what they now claim it
> does, it was incumbent on them to assert the
> bar to rescission upon receipt of Plaintiffs'
> notice of rescission, in their answer,
> discovery responses, summary judgment
> motions, trial brief, or motions in limine.
> Instead, Defendants allowed the entire case
> to proceed, even acquiescing that rescission
> was an available remedy at the pretrial
> conference (See Pltfs' ER, Ex. J at 18),
> without mentioning that any provision of the
> Lease, in their view, barred rescission.  A
> clearer case for equitable estoppel could not
> be made.

Flagship's reference is to the hearing on motions in limine

conducted on October 31, 2003, where the Court inquired "whether

anybody wants the jury to be making any findings on the rescission."  Mr. Fairbrook indicated that Flagship wished issues of contested fact as to equitable matters submitted to the jury.  Mr. Carroll stated:

> The defense perspective is that there's two issues really.  One is we believe the plaintiffs have taken the position that mistake is no longer an issue in this case, both in conjunction with the pretrial statement and in the opposition of motions for summary judgment.
>
> The only grounds for rescission left in the case at this point is a failure for consideration.  That's the position we take, that's what's been represented, that's the position we understood to be the case at this juncture.

(Doc. 502, Exh. J).

There is no question that Excel failed to assert that Section 4.5 precluded the remedy of rescission until after the trial in this action and that Excel's delay in asserting its interpretation of Section 4.5 caused undue attorney and judicial time in post-trial proceedings involving Flagship's election of the rescission remedy.  Excel's contention that Flagship was always aware that Section 4.5 barred rescission by Flagship of the lease because of Excel's breach of the exclusive use provision is not supported by the record in this action and Excel's belated assertion of its position precluded Flagship from conducting discovery concerning Excel's interpretation of Section 4.5 or seeking summary judgment as to the construction of Section 4.5 in the context of extrinsic evidence.  The position was also

unknown to the Court.  The Section 4.5 bar theory was not asserted in pleadings, it was not specifically disclosed in the Pretrial Order, nor was it the subject of any discussion in a trial brief or in jury instruction input.

      10.  **Arguments Raised by Excel in Opposition to Flagship's Motion**.

     In opposing Flagship's motion, Excel asserts that rescision is barred because Plaintiffs, by their conduct, affirmed the Ground Lease after they asserted that Excel breached it, and because Plaintiffs failed to proffer the written consent of the Money Store to extinguish the estate created by the Ground Lease as required by Section 22.4.  It is in connection with this latter contention that Excel's motion to strike and/or for leave to file a sur-reply brief is directed.  In addition, Flagship contends that Excel attacks the jury instructions with respect to rescission.

      a.  **Outside the Ninth Circuit's Mandate**.

     Flagship argues that these contentions are outside the mandate of the Ninth Circuit, e.g., to "determine in the first instance whether the contract, in its entirety, allows for rescission and whether California law would give effect to the lease's limitations on remedies in these circumstances."

     As explained in *Kearns v. Field*, 453 F.2d 349, 350 (9th Cir.1972):

> The mandate is controlling as to all matters within its compass ...; however, any issue not expressly or impliedly disposed of on

> appeal may be considered by the trial court
> on remand.

Flagship's contention raises the question whether the Ninth Circuit's remand is a "limited remand" or a "general remand." The term "limited remand" describes a remand to the district court for proceedings prior to the Ninth Circuit's consideration of the merits of an appeal. *See United States v. Washington,* 172 F.3d 1116, 1118 (9th Cir.1999), citing *Mirchandani v. United States*, 836 F.2d 1223, 1225 (9th Cir.1988). Once an appeal has been decided on the merits, the mandate is issued; if the case is remanded for further proceedings, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal. *Id.*, citing *Stevens v. F/V Bonnie Doon*, 731 F.2d 1433, 1435 (9th Cir.1984). The mandate "'is controlling as to all matters within its compass, but leaves the district court any issue not expressly or impliedly disposed of on appeal.'" *Id.*

In contending that the issues raised by Excel are outside the mandate, Flagship asserts that it is clear that the Ninth Circuit specifically directed the Court to decide whether Section 4.5 of the Lease, as construed in its entirety, is a bar to rescission. Flagship argues:

> While the court expressly left open the
> question of rescission damages, the mandate
> did not set the case at large. Importantly,
> the court of appeal did not disturb the
> jury's verdict. Most significantly in this
> regard, Excel on appeal attacked the jury
> verdict in two respects: arguing that the
> jury was not instructed on rescission, and

> that the evidence was insufficient to support
> a finding of material breach, necessary to
> support rescission ... In issuing a limited
> mandate that the district court must decide
> whether Section 4.5 of the Lease bars the
> remedy of rescission, the court of appeal
> impliedly rejected these arguments.  In this
> regard, it would make little sense to remand
> the case to the district court to determine
> if rescission could be elected by Plaintiffs
> if the jury's finding of a material breach
> was not supported by the evidence as Excel
> contended on appeal.  Accordingly, implied
> within the court of appeal's mandate is a
> rejection of Defendants' claims of
> instructional error and sufficiency of the
> evidence.

Flagship's contention is without merit.  The Ninth Circuit's remand is broad enough to permit the Court to consider whether rescission, if permissible under the terms of the lease, is nonetheless barred under California law because of Flagship's conduct after notice of rescission was given.

### b.  Rescission Barred by Flagship's Conduct.

Excel argues that rescission is barred because Flagship affirmed the Lease after asserting that Excel had breached it.

Excel cites 1 Witkin, *Summary of California Law*, Contracts, § 886: "The injured party may lose his right to rescind by ... conduct (such as retention of benefits) indicating an election to affirm the contract."  Excel further cites *Neet v. Holmes*, 25 Cal.2d 447, 457-458 (1944):

> The general rule, with certain exceptions not
> applicable to the facts involved in the case,
> is that the offer to restore what has been
> received under the contract is a condition
> precedent to maintaining an action founded on
> the assumption that rescission has been
> accomplished by the act of the party ... The

76

> right to rescind may be waived ... It is
> waived by recognition of the existence of the
> contract after the right to rescind was
> created ... Waiver of a right to rescind will
> be presumed against a party who, having full
> knowledge of the circumstances which would
> warrant him in rescinding, nevertheless
> accepts and retains benefits accruing to him
> under the contract ... It has been said that
> citation of authorities is unnecessary in
> support of the doctrine well established in
> this state that an affirmation of the contract
> at a time subsequent to the discovery of the
> falsity of the representations inducing its
> execution forecloses the exercise of the
> right of rescission.

Excel argues that Flagship affirmed the Lease by entering into two Forebearance Agreements with The Money Store in October 2001 and October 2002, respectively.  (Excel's Response, Exhs. B and C).  The Forebearance Agreements each provide that Flagship "shall continue to make monthly lease payments to Excel Realty Partners."  The Forebearance Agreements provide:

> It is expressly understood that the failure
> to make payments or meet any term as
> referenced in this Agreement will constitute
> a default of the Forebearance Agreement and
> [TMS] will then be free to exercise any and
> all rights consistent with the Stockton Loan
> and the Modesto Loan agreements.

Excel asserts that Flagship voluntarily entered into the Forebearance Agreements with full knowledge of their terms and agreed to dismiss The Money Store from this lawsuit in exchange for Flagship's covenant to keep the Lease in full force and effect.  Excel refers to a partial transcript of the Rule 50 motions during the jury trial on November 26, 2003:

> And I don't know - my tentative ruling is I
> don't see this as a constructive eviction

77

1    case.

2    MR. FAIRBROOK: Okay.

3    THE COURT: So I will read those cases and I
     will give it some thought, but that's the way
4    I see it.

5    MR. FAIRBROOK: Let me underscore one point
     for you.  I think the critical factor is, and
6    the evidence is this, that we closed the
     restaurant, the equipment was removed, and it
7    remained vacant but for the attempts -

8    THE COURT: I know that, but you are charged
     with knowledge of the law and the fact that
9    - and there are good reasons, you know, not
     to have sued, but you could have sued the
10   lender for putting you in this position and
     for not backing you a hundred percent, and
11   you chose to compromise with that lender
     because they have got the gun at your head
12   and they are saying, in other words,
     'Mitigate, try to find a new tenant, keep
13   paying the rent, don't just use the real
     property remedies here and the contract
14   remedies, but primarily the real property,
     which says when you are constructively
15   evicted, you have got to go, you have got to
     get out and give back the keys.'
16
     ...
17
     MR. FAIRBROOK: When they talk about those,
18   they talk about the benefit that the tenant
     receives by remaining in possession and
19   hedging his bets on whether he is going to
     overcome it and none of those, none of those
20   things exist here.  And that's why I think
     those cases -
21
     THE COURT: I know that.  And - but what the
22   law says, and you are not in the strong
     bargaining position where you are in default
23   on a $2 million loan, quite frankly, and the
     lender is willing to do anything, except
24   basically cut you off.

25   So the bottom line is that, unfortunately,
     counsel for the lender wasn't willing to
26   recognize that your optimum condition was to

                      78

> return the keys and get as far away from that
> site as you possibly could.

(Excel's Response, Exh. D).

Excel further refers to evidence that Flagship retained a real estate agent from April 2001 through the trial to market the Premises for sale or sublease and that, in 2001, Flagship had a specific buyer and conducted negotiations with The Money Store, Excel, and the potential buyer to sell the Lease and the Premises.  (Excel's Response, Exh. B).  Excel asserts in a footnote:

> After this proposed sale fell through,
> Plaintiffs destroyed the *status quo ante* by
> agreeing to a distress sale of the Golden
> Corral's restaurant equipment, in which
> equipment that Plaintiffs claim 'cost'
> $600,000 was disposed of for $11,000.00.
> Here again, Plaintiffs acted in a manner
> wholly inconsistent with rescission.

Excel contends that, in October 2003, on the eve of trial, Flagship sublet the Premises for a Halloween costume store.  All of this conduct, Excel argues, demonstrates that Flagship waived the right to rescind the Lease by its conduct:

> Here, Plaintiffs not only continued to treat
> the Ground Lease as binding by paying rent
> and subletting the premises, but they also
> held out the Ground Lease as binding to third
> parties, when they attempted to sell it and
> the restaurant business.

However, as Flagship notes, Excel expressly confirmed during the trial that Flagship's continued payment of rent was not a basis for waiver of the right to rescind:

> MR. CARROLL: Your Honor, I don't believe
> there has been any claim made that - because

1    of relevance, that the payment of any of the
     lease payments was in any way a defense in
2    this case.

3    THE COURT: I understand there to be a claim
     for the lease payments because there is a
4    claim for rescission as of the date of notice
     of termination of the lease and, therefore,
5    this is relevant evidence because they are
     continuing to pay under protest because they
6    were required by the lender.

7    MR. CARROLL: We are not contending in this
     case that continued payment in any way is a
8    defense for or impairs their ability to
     rescind.

9
     THE COURT: It's an element of damage that is
10   sought to be recovered.

11   MR. CARROLL: But this letter isn't an element
     of damages.  The check is, your Honor.
12
     MR. WASHBURN: There are claims of waiver and
13   estoppel.

14   THE COURT: So long as waiver and estoppel is
     claimed.
15
     MR. CARROLL: Not on the defense of any
16   payments.  It has never been in this case.

17   THE COURT: What we will do is this.  On that
     condition, that there be no argument to the
18   jury and there be no suggestion that the
     continued payment of rent under protest would
19   be a waiver of [sic] estoppel, which would be
     a waiver of any kind of defense.  We will
20   keep the letter out, but we have already got
     the witness' testimony about how long they
21   continued to make these rent payments. [¶]
     You may ask your next question.
22
(Excel's Motion, Exh. K, 590:17-591:21).
23
         Flagship argues that Excel is now judicially estopped from
24
asserting that Flagship's continued payment of rent waives
25
rescission of the Lease.  Determining whether judicial estoppel
26

                              80

should be invoked is informed by several factors: (1) whether a party adopts a position clearly inconsistent with its earlier position; (2) whether the court accepted the party's earlier position; and (3) whether the party would gain an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *New Hampshire v. Maine*, 532 U.S. 742, 750-751 (2001).  In addition, Flagship argues that Excel's argument violates the Ninth Circuit's mandate:

> The court of appeal's mandate and findings with respect to the defense of rescission and judicial estoppel are targeted at Defendants' attempt to defeat rescission on the basis of Section 4.5 of the Lease, not on the basis of Plaintiffs' *conduct*.  To allow Defendants to raise the defense of waiver based on conduct at this stage would violate the court of appeal's mandate and would amount to reconsideration of the jury's verdict.

Flagship further argues that the continued payment of rent under protest on a premises Flagship had vacated and was deriving no benefit from, does not demonstrate affirmation of the Lease, citing *DRG/Beverly Hills, supra*, 30 Cal.App.4th at 59: "Waiver is the intentional relinquishment of a known right after full knowledge of the facts and depends upon the intention of one party only."  Flagship contends:

> Defendants offered nothing with respect to Plaintiffs' intent to negate the evidence of payment of rent under protest and the intent to rescind.  The evidence was that Plaintiffs surrendered possession, but that Plaintiffs' surrender was refused by Defendants.  Moreover, the evidence offered at trial was that after the close of Plaintiffs' business in April 2001, Plaintiffs never operated a restaurant there or enjoyed use of the

81

premises.  Instead, due to Defendants'
refusal to accept Plaintiffs' surrender as a
means of mitigation, Plaintiffs entered into
an agreement with the bank wherein Plaintiffs
agreed to pay rent ... The evidence further
offered by Plaintiffs demonstrated that with
each rent payment made under protest, a
protest letter was sent, thus indicating an
affirmative intent *not to affirm the lease or
accept its benefits*, a fact which Defendants
conceded in order to keep the protest letters
out of evidence ... In other words, the
evidence in this case was that Plaintiffs'
continued payment of rent under the
forebearance agreements was done not in an
attempt to do any fact inconsistent with the
claim of rescission, but simply, as an effort
to mitigate.

With regard to the rental of the Premises to a Halloween
store, Flagship asserts that Excel is repeating an argument made
unsuccessfully to the jury, that the temporary rental of the
Premises during the litigation and just prior to trial barred
Plaintiffs' constructive eviction claim.  Flagship asserts that
Excel's reference to the Rule 50 motion transcript fails to
report that the Court denied Excel's Rule 50 motion on the
constructive eviction claim.  (Flagship's Supp. Excerpts of
Record, Exh. O, 1415-1450).  Flagship asserts that Excel did not
argue to the jury that the Halloween store payment was a ground
to deny rescission; the jury found for Flagship on the
constructive eviction claim and that Flagship had mitigated its
damages.

Flagship's entry into the Forebearance Agreements with The
Money Store and its continued payment of rent did not constitute
a waiver of any right to rescind the lease.  Flagship continued

to make the rental payments under protest.  Excel's trial counsel affirmatively represented to the Court during trial that Flagship's continued payment of rent did not impair Flagship's ability to rescind the lease, nor was it used to argue waiver. The Court made an evidentiary ruling and limited evidence and argument to the jury based on Excel's representation.  To now allow Excel to argue that Flagship's continued payment of rent waived any right of rescission would be rewarding bad faith and is wholly inconsistent with Excel's earlier position, upon which the Court relied in making rulings and Flagship relied in limiting its proof.  It would give Excel an unfair advantage which prejudices Flagship at this late stage of the proceedings. The elements of judicial estoppel are met and Excel is estopped to claim waiver based on the Money Store loan and Flagship's rent payments.

As to Flagship's attempts to market the premises for sublease and its sublease in October 2003 do not establish Flagship's waiver of rescission.  Excel never argued to the jury or during the lengthy post-trial proceedings that these actions by Flagship waived any right of rescission.  Excel's conduct is unacceptable.  Flagship's actions to reduce its losses were under protest and do not constitute a waiver of the right of rescission.

c.  Rescission Barred Because Flagship Failed to Proffer Written Consent of The Money Store to Extinguish the Estate Created by the Ground Lease as Required by Section 22.4.

For what appears to be the first time, Excel now argues that rescission is barred because Flagship failed to proffer the written consent of The Money Store to extinguish the estate created by the Lease as required by Section 22.4 of the Lease.

Section 22.4, captioned "No Merger of Title," provides:

> There shall be no merger of this Lease or the estate created by this Lease with any other estate in the Premises or any portion thereof by reason of the fact that the same person, firm, corporation or other entity may acquire or own or hold, directly or indirectly:
>
> (a) this Lease or the estate created by this Lease or any interest in this Lease or in any such estate and
>
> (b) any other estate in the Premises or any part thereof or any interest in such estate, and no such merger shall occur unless and until all persons, corporations, firms and other entities, having any interest (including a security interest) in (i) this Lease or the Estate created by this Lease and (ii) any other estate in the Premises or the improvements or any portion thereof shall join in a written instrument effecting such merger and shall duly record the same.

Excel contends that an order granting rescission would effectively extinguish the leasehold estate created by the Ground Lease and thereby merge Flagship's former leasehold estate into Excel's fee estate.  This merger, Excel argues, is prohibited by Section 22.4 in the absence of The Money Store's written consent, which Flagship did not proffer.  Excel cites *Swanston v. Clark*, 153 Cal. 300, 304 (1908) as authority.

*Swanston,* a more than 100 year old case, first surfacing eight years after this action commenced, involved an action to

84

enforce specific performance of a written contract to sell real

estate.  The complaint alleged that the contract consisted of a

lease for five years and an option to the lessees to purchase the

property at any time during the term of the lease for a fixed

price per acre; that plaintiffs, the lessees, elected to buy the

land pursuant to the option, made due tender of the purchase

price and demanded execution of the deed, which defendant

refused; that two clauses to which the parties had agreed, to the

effect that the plaintiffs were to allow improvements made by

them during their possession to remain on the premises, in case

they failed to exercise the option to purchase, and that

plaintiffs should pay the rent for the five years, if they did

not sooner exercise the option to purchase, were, by mutual

mistake, omitted from the contract, and that by like mistake a

clause was inserted giving plaintiffs the right to remove such

improvements if they did not purchase.  The defendant, in her

answer, alleged that the contract had been rescinded by her

before the plaintiffs' tender.  The Supreme Court affirmed,

sustaining a demurrer to this part of the answer:

> It did not aver an offer to repay the
> plaintiffs the money expended by them in
> improvements on the land, but only to repay
> the moneys 'paid her by them' and 'to restore
> everything received by her under the
> agreement.'  The complaint alleges the making
> of valuable improvements by the plaintiffs on
> the faith of the option to purchase.  This
> special answer did not deny the making of
> these improvements and it cannot be said that
> the improvements had been 'received' by the
> defendant.  Hence, the offer to restore, as
> alleged in the answer, did not include an

offer to compensate the plaintiffs for the
moneys expended by them in improving the
property and was insufficient to accomplish a
rescission.  Again, a party to a contract
cannot rescind at his pleasure, but only for
some one or more of the causes enumerated in
section 1689 of the Civil Code.  One seeking
to rescind a contract, or to enforce a
rescission when he claims he has effected in
the manner provided in section 1691 of the
Civil Code, must allege facts showing that he
had good right to rescind, and for what cause
a rescission had taken place, or that a
rescission had been made by consent ... The
same rule controls where a rescission is
averred as a defense ... The special defense
does not aver any facts in regard to
defendant's right to rescind and does not
show a rescission by consent.  It is
therefore insufficient.

The court did not err in adjudging that the
defendant should convey the land free from
all liens and encumbrances.  The contract
provided that she should convey it free from
all liens and encumbrances, 'except such as
may be created by the terms of this
instrument as a lease of said premises."  The
conveyance of the property to the plaintiffs
in fee would effect a complete merger of the
two estates, and the lease would not
thereafter be an encumbrance.  The execution
of the deed by the defendant would be a
complete performance so far as the lease was
concerned.  The contract, as reformed, did
not contemplate or provide that she should
retain any right or interest under the lease
after she had conveyed in pursuance of the
option, even if it did not have that effect
before reformation.  The lease, therefore,
did not constitute an encumbrance within the
scope of the covenants in a grant deed.  We
cannot, upon these appeals, take notice of
any liens for reclamation district taxes that
may have accrued after the trial.  The
defendant, it may be observed, could have
escaped that liability at any time by
performing the liability accrued.  The
statement in the record relating to the
motion made by defendant to amend the
judgment so as to except such liens, and the

86

order denying the same, show that the
judgment was entered before the motion and
order were made.  It was therefore an order
made after final judgment and it cannot be
reviewed on appeal from the judgment itself.
The defendant did not appeal from the order.
As to the liens for ordinary taxes, which may
be presumed to have accrued between the time
of plaintiffs' tender, in January, 1903, and
the date of the entry of the judgment, in
January, 1905, it is sufficient to say that
the defendant, having refused to accept the
money and make the deed as the judgment
declares she should have done, is in no
position to complain of the consequence of
her own breach of contract.

Flagship replies that Section 22.4 is not an anti-rescission clause:

Rather, its purpose is simply to prevent the
extinguishment of the Lease by operation of
the doctrine of equitable conversion in the
event the ground upon which the restaurant
was acquired by Flagship, the lessee [sic].
This clause simply has no application to
Plaintiffs' claim of rescission.  Nor does
this provision make a third party's consent
necessary for the Plaintiffs to elect any
particular remedy.  It simply prevents a
merger of the leasehold estate with the fee
estate, in order to protect secured lenders
such as The Money Store.  In fact, this
provision is simply a confirmation of the
equitable nature of the doctrine of merger,
and the principle 'that the doctrine [will]
not be applied to extinguish a leasehold
estate when the lessee acquire[s] the fee,
when the application of the doctrine would
[prejudice the rights of an innocent third
party.'

In so asserting, Flagship cites *6424 Corporation v. Commercial Exchange Property, Ltd.*, 171 Cal.App.3d 1221 (1985).

*6424 Corporation* involved real property subject to a 99-year ground lease which began in 1912.  Holland Park Investors

87

(Holland) became the owner of the leasehold interest on December 17, 1980.  The leasehold at that time was subject to purchase money encumbrances consisting of a $400,000 first trust deed in favor of Commercial Exchange (CEL), an $840,000 all-inclusive second trust deed in favor of La Mesa Enterprises (La Mesa), and a $2.2 million all-inclusive third trust deed in favor of Commercial Exchange Property (CEP).  Holland immediately sold its leasehold interest to the Kures.  Two days later, the Kures purchased the fee interest in the property, thereby becoming concurrent owners of the fee and the leasehold.  Two years later, the Kures conveyed their interests in the property by grant deed to IFR Realty, which the next day conveyed the property to Wendt. In that transaction, Wendt executed and delivered a trust deed in favor of IFR which encumbered the fee.  A year later, IFR assigned Wendt's trust deed to 6424 Corporation.  Thereafter, 6424 Corporation brought an action for declaratory relief and cancellation of instruments, asserting that the leasehold was merged with the fee when the Kures acquired concurrent ownership of both estates, with the result that the liens associated with the trust deeds of CEL, La Mesa and CEP were extinguished.  The trial court granted summary judgment for CEL, La Mesa and CEP, declaring that the leasehold and the fee did not merge so as to render their trust deeds invalid.  The Court of Appeals affirmed:

> While various arguments for reversal and in support of the trial court's determination are proffered by the parties, we are of the view the matter is disposed of by a principle sufficiently fundamental as to require little

discussion, namely that: 'The doctrine of merger is to be applied in a manner calculated to prevent injustice, injury and prejudice to the rights of innocent third persons [such that] it has been held that the doctrine [will] not be applied to extinguish a leasehold estate when the lessee acquire[s] the fee, when the application of the doctrine would [prejudice] the rights of an innocent third party.' ....

In contravention of this well-founded and manifestly equitable proposition, what is sought to be established by appellant is no more nor less than that, based solely upon the circumstance of the fee and the leasehold estates having been placed in the ownership of the Kures, the otherwise legitimate interests of respondents, acknowledged and accepted as valid by the Kures ..., should be found to have disappeared, through application of a rule which in all events 'arose out of the fondness of the law for convenience and symmetry, [but which] was never designed to defeat the rights of a third party, which had intervened before the merger took effect.' ....

171 Cal.App.3d at 1223-1224.

Excel argues that *6424 Corporation* is distinguishable:

There, the lease did not contain an anti-merger clause, whereas here, § 22.4 specifically requires the signature of all interested parties as a precondition to extinguish the lease.  Furthermore, it was the *tenant* in *6424 Corp.* that had acquired the fee estate and, thereafter, wrongfully attempted to escape its liabilities by extinguishing the interests of the leasehold mortgagees via merger.  In contrast, here, the effect of the tenant rescinding would be to merge the lease estate into the *landlord's* fee estate.  The litigation issues in *6424 Corp.* were the result of the absence in that lease of a provision such as § 22.4.  *6424 Corp.* is actually a case study to remind practitioners to include clauses such as § 22.4, particularly in long-term ground leases.

89

Flagship argues that The Money Store consented to the

prosecution of the action, including the claim for rescission

when it entered into the Forebearance Agreements with Flagship.

Flagship refers to Paragraphs 6-7 of the October 2001

Forebearance Agreement :

> D.   The parties have reached an agreement to
> forebear on the existing collection actions
> and lawsuit.  In consideration of the mutual
> promises, covenants, conditions and terms set
> forth herein, and in consideration of the
> accuracy of the Recitals, which are hereby
> confirmed and incorporated into this
> agreement by this reference, the undersigned
> parties hereby agree as follows:
>
> ...
>
> 6. TMSIC hereby agrees to release
> its interest in the Modesto Property at 1800
> Prescott Road in Modesto, California for the
> sum of $900,000 provided that sum is the
> proceeds from the result of the sale to Mr.
> Valdez and Mr. Vaca or such other tenant as
> the landlord may approve provided that the
> minimum release payment from such other
> tenant as the landlord may approve will be
> $900,000 or the net proceeds available from
> the sale, whichever is greater.  It is
> understood that this payment amount shall be
> applied to past due arreages on the Modesto
> loan and then to the principal on the Modesto
> loan.  At no time should the payment under
> this paragraph exceed the balance due under
> the loan.
>
> 7.   Flagship and Reiche agree to
> execute an appropriate assignment to Money
> Store and TMSIC the [sic] net proceeds of the
> litigation of Reiche and Flagship in Case No.
> 290308, in Stanislaus County [removed on
> February 21, 2001 and assigned Case No. CV-F-
> 02-5200].  The proceeds will be applied to
> the past-due arrearages on the Modesto Loan,
> if any, and then to a reduction of the
> principal balance.  Flagship will be
> reimbursed for all costs, attorney fees and

1             expert witness fees and other expenses
incurred in the litigation, including
2             Flagship's payment of rent to the landlord
since the closure of Flagship's restaurant on
3             April 1, 2001.  The reimbursement will first
come from the proceeds of the litigation.
4             The first $500,000.00 of the net proceeds
would go to TMSIC.  Any net proceeds over
5             $500,000.00 from the litigation will be
equally divided between TMSIC and Flagship.
6             TMSIC will share in the net proceeds only to
the extent required to satisfy past-due
7             arrearages on the Modesto Loan and pay the
principal balance on the Modesto Loan in
8             full.

9 (Excel's Response, Exh. B).   Flagship asserts that the interests

10 of The Money Store were fully protected in the Forebearance

11 Agreement "and no intent is evinced by that agreement that The

12 Money Store, originally a party to the lawsuit and well aware of

13 Flagship's claims for rescission, had any objection to the remedy

14 of rescission."

15      Excel replies that Flagship's reliance on Paragraphs 6-7 of

16 the October 2001 Forebearance Agreement is misplaced.  Referring

17 to Paragraph 6, Excel contends: "Obviously, Plaintiffs never

18 adduced evidence of a sale to Mr. Valdez and Mr. Vaca or anyone

19 else, because such event did not occur."  Excel contends:

20              Nothing in the Forebearance Agreement
provides the written consent required by §
21              22.4.  On the contrary, the Forebearance
Agreement requires Plaintiffs to pay rent and
22              otherwise maintain the Ground Lease in good
standing to protect TMS's security interest.
23              (*Id.* at ¶¶ 4,7).

24 Excel asserts that the October 2002 Forebearance Agreement

25 deleted paragraph 6 and was silent with respect to The Money

26 Store's security interest.

Excel's view of the terms of the October 2002 Forebearance Agreement are misplaced.  While the references to the proceeds of the sale to Valdez and Vaca were deleted, it does not appear that the October 2002 Forebearance Agreement "was silent with respect to The Money Store's security interest."  Section F of the October 2002 Forebearance Agreement provides:

> The parties have reached an agreement to forebear on the existing collection actions. In consideration of the mutual promises, covenants, conditions and terms set forth herein, and in consideration of the accuracy of the Recitals, which are hereby confirmed and incorporated into this agreement by this reference, the undersigned parties hereby agree as follows:
>
> 1. Money Store and TMSIC shall forebear from filing their Notice of Sale on the Stockton Loan and the Modesto Loan.
>
> ...
>
> 4. Flagship and Reiche shall continue to make monthly lease payments on the Modesto Property to Excel Realty Partners ....
>
> 5. Net proceeds of any litigation between Reiche and Flagship in the United States District Court, Eastern District case ... will be applied to past due arrearages on the Modesto Loan, if any, and then to a reduction of the principal balance.  Flagship will be reimbursed for all costs, attorney fees and expert witness fees and other expenses incurred in the litigation, including Flagship's payment of rent to the Landlord since the closure of Flagship's restaurant on April 1, 2001.  The reimbursement will first come from proceeds of the litigation.  The first $500,000.00 of the net proceeds will go to TMSIC.  Any net proceeds over $500,000.00 from the litigation will be equally divided between TMSIC and Flagship.  TMSIC will share in the net

1    proceeds only to the extent required to
    satisfy past due arrearages on the Modesto
2    Loan and pay the principal balance on the
    Modesto Loan in full.

3
     6. The forebearance of publishing
4    the Notice of Sale shall continue until the
    earlier of the failure of Reiche and Flagship
5    to honor each and every term and condition
    obtained herein, the issuance of a final
6    judgment in Case No. CIV-F-02-5200 REC DLB,
    in the United States District Court, Eastern
7    District, or twelve (12) months from the date
    of execution of this Agreement.

8
(Excel Response, Exh. C.).

9
  Flagship further asserts: "[A]s noted on the record, The

10
Money Store received payment, and accordingly no longer has any

11
interest in the property."   In so asserting, Flagship refers to

12
the transcript of a status conference on February 15, 2006:

13
    THE COURT: All right.  And as I then would
14    understand it, all of this activity that is
    the subject of concern happened after the
15    trial and after Mr. Reiche's accident.

16    MR. FAIRBROOK: Yes ... A year and a half
    after the trial, we did enter into
17    negotiations and we retired that obligation.
    And, as a result, the only significance to
18    this case is that the Court had indicated in
    its prior ruling that we would receive as
19    compensation interest on that loan, not - the
    principal was never alleged to have been an
20    item of damage, but simply the financing
    charges. [¶] And in the submission that we
21    submitted to your Honor, we stopped the
    accrual of that interest at the same time as
22    that loan was retired, and that's the only
    significance that I can see on this.

23
(Flagship's Supp. ER, Exh. Q, 4:23-5:13).   Flagship also submits
24
Exhibit S in its Supplemental Excerpts of Record, a Substitution
25
of Trustee and Reconveyance of Deed of Trust dated September 20,
26

1  2005, wherein The Money Store reconveyed any interest is the

2  lease as part of the deed of trust to Flagship.

3      Excel moves to strike Exhibit S to Flagship's request for

4  judicial notice filed in support of its reply brief and pages

5  15:20-16:19 of Flagship's reply brief.  Alternatively, Excel

6  moves for leave to file a sur-reply brief.

7      In moving to strike, Excel relies on the Supplemental

8  Scheduling Conference Order filed on August 14, 2009 (Doc. 499),

9  states: "Plaintiff shall not raise any new matter in the reply

10  memorandum of law."

11      It is Excel, not Flagship, that raised this issue in its

12  opposition brief.  The Supplemental Scheduling Order was not

13  intended to preclude Flagship from responding to arguments made

14  by Excel in its opposition to Flagship's motion.

15      Excel also bases its motion to strike on the ground that

16  Flagship's exhibit and argument violate that "Memorandum Decision

17  Re Rescission Damages and Availability of Prejudgment Interest"

18  filed on November 14, 2006, (November 14, 2006 Memorandum

19  Decision; Doc. 387), which Excel asserts barred evidence of

20  Flagship's post-trial dealings with The Money Store.  The portion

21  of the November 14, 2006 Memorandum Decision discussing accrued

22  interest on The Money Store Loan through trial, provides:

23          Most critically, what Wallace did not do was
            to calculate (or otherwise consider) the
24          effect of the foreclosure agreement on the
            calculation of interest accruing after
25          October 2001.  Nor did he give credit for the
            $900,000 lump sum payment or calculate
26          interest based on the reduced unpaid

94

> principal balance resulting from the lump sum
> payment.  It was incumbent on Plaintiffs to
> make these calculations.  They have not done
> so.  They have failed to prove the amount of
> any accrued unpaid interest on the Money
> Store Loan and the effect of the forbearance
> agreement on the accrual of interest.
> *Plaintiffs did not present this information
> at trial and refused to provide such evidence
> post trial.  They are bound by their choice.
> Plaintiffs shall not recover any other
> accrued interest.*

[Doc. 387; 20:9-21, emphasis added].  Excel argues that Flagship

is bound by this ruling and by their choice that evidence of

Flagship's post-trial dealings with The Money Store will not be

admitted.  Excel contends that Flagship now attempts a "back door

maneuver" to put into the record evidence that the November 14,

2006 Memorandum Decision bars, Exhibit S.  Excel contends that

the stated purpose for proffering Exhibit S is to show that The

Money Store received payment and, accordingly no longer has any

interest in the property:

> Plaintiffs had the burden to prove at trial
> that they were entitled to rescind the Ground
> Lease, but they failed to meet it.  It was
> not Excel's burden to prove that rescission
> was unavailable.  Plaintiffs failed to adduce
> evidence of TMS's consent to a merger of the
> Ground Lease estate with the fee, which would
> be the direct result of the rescission
> Plaintiffs sought.  Evidence of TMS's consent
> was essential for Plaintiffs to comply with §
> 22.4, and Plaintiffs are foreclosed from
> proffering it now.

As the ruling provides, Flagship was precluded from offering

evidence about postjudgment interest.  To the extent that Excel

moves for leave to file a sur-reply brief addressing the impact

of Exhibit S, the motion is moot.  Excel's arguments in

opposition to Flagship's discussion of Exhibit S have been fully considered.

Flagship was not required to obtain Excel's written consent to the Money Store loan.  There is no merger.  Excel's arguments fail.

### CONCLUSION

For all the reasons stated, the lease, in its entirety, allows for rescission and California law would give effect to rescission of the lease under the totality  circumstances of this action.

IT IS SO ORDERED.

Dated:   December 20, 2010                    /s/ Oliver W. Wanger
                                        UNITED STATES DISTRICT JUDGE